THE STATE OF OHIO, APPELLEE, *v.* MITCHELL, APPELLANT.

[Cite as State v. Mitchell, 18 Ohio App. 2d 1.]

(No. 9210—Decided April 1, 1969.)

**2**

*Mr. C. Howard Johnson*, prosecuting attorney, and *Mr. David H. Bodiker*, for appellee.

*Mr. William W. Lamkin*, for appellant.

TROOP, J.  Gerald L. Mitchell, defendant, appellant herein, was indicted by the Franklin County Grand Jury for violations of the Uniform Narcotic Drug Act, being Chapter 3719 of the Revised Code, on two counts of obtaining more than one preparation of an exempt narcotic, as defined in Section 3719.15, Revised Code, within a 48-hour period in violation of Section 3719.16, Revised Code.  Trial to a jury resulted in a verdict of guilty on both counts.  This appeal is from that verdict and the judgment entered pursuant thereto.  A motion for a new trial was overruled.

Counsel for the defendant has noted six assignments of error as the basis for this appeal.  The six can be summarized as (1) objection to the evidence, *i. e.*, it was hearsay, confrontation was denied, and it was insufficient to make a prima facie case, (2) the court erred in its charge, and (3) the statutes upon which the charges were predicated were unconstitutional in that they are so vague and uncertain as to deprive the defendant of the right to be informed of the accusation against him and in that they provide cruel and unusual punishment.  The approach in this review will be to discuss the topics rather than numbered assignments of error.

By way of background to the consideration of the assigned errors, reference is to Chapter 3719, Revised Code. The caption line, introductory to the text of the law, is "[UNIFORM NARCOTIC DRUG ACT]."  The title suggests an act of significance within and beyond this jurisdiction. Certain language used in some sections indicates that the Ohio statute bears some relation to the federal narcotic laws and is correlative thereto.  Attention is directed to some particular sections as having a bearing upon, and pertinent to, the arguments made by counsel for the defendant.

Sections 3719.021 and 3719.03, Revised Code, provide for the licensing of the manufacturers of narcotic drugs,

and the pharmacists who dispense them, and establish the qualifications of those licensees. Section 3719.04, Revised Code, regulates the sale of the drugs to the pharmacist, and Section 3719.05, Revised Code, regulates the pharmacists. A record of drugs received and sold, and otherwise handled or processed, is required by Section 3719.07, Revised Code. Subsection (F) relates to the manufacturer, who must "keep a record of all narcotic drugs compounded, * * *, or by any other process produced or prepared * * *." The owner of a pharmacy gets specific direction in Subsection (G) (2). His record must show:

"The name, place of residence, and signature of each person to whom narcotic drugs including those otherwise exempted by Section 3719.15 of the Revised Code are dispensed, the kind and quantity of such narcotic drugs dispensed to each person, the date such narcotic drugs are dispensed to each person, and the name and address of the practitioner prescribing drugs to the person to whom they are dispensed."

Directly concerned in the instant case is Section 3719.08, Revised Code, titled, "Labeling." It requires a manufacturer who dispenses a narcotic drug in a package prepared by him to attach a label to each package, showing "in legible English the name and address of the vendor and the quantity, kind, and form of narcotic drug contained therein." Carefully detailed limitations as to the possession of narcotic drugs are set out in Section 3719.09, Revised Code.

The narcotics act is designed to control all phases of the production and distribution of narcotic preparations from manufacturer through distribution to the "obtainer" by the provisions of Sections 3719.01 through 3719.09, and others, Revised Code.

This case involves the sale of an exempt narcotic as defined in Section 3719.15, Revised Code, the sale and purchase of which is limited by Section 3719.16, Revised Code. Counsel for defendant appears to urge that the sections noted are not clear. The principal point made in support of his position is that the sections make no pro-

vision for those situations where more than the stipulated quantity is contained in the preparation. The simple, direct answer is clear—the preparation is then not an exempt preparation such as the one with which we are concerned here.

An exempt preparation is clearly defined in Section 3719.15, Revised Code. It is a "medicinal preparation" containing in one fluid ounce, and as in the instant case, "Not more than one grain of codeine or of any of its salts." These "medicinal" preparations, here "terpin hydrate with codeine, four ounces," may be purchased for an ordinary curative use—"It's commonly used as a cough preparation,"—but, because of its narcotic ingredient, such purchase must be within limits prescribed by statute, set out in Section 3719.16, Revised Code, the applicable part of which is as follows:

"No person shall obtain or attempt to obtain, under the exemptions of Section 3719.15 of the Revised Code, more than one preparation exempted by the provisions of that section within forty-eight consecutive hours."

Rather clearly, the Legislature is saying that more frequent sale, and use, means a departure from ordinary medicinal use into the area of use for purposes of narcotic effect. Limits are clearly defined. One preparation in 48 hours is medicinal use.

In this modern day, thousands of pharmaceuticals are compounded, processed, or produced, and then packaged and labeled for distribution in that package for direct sale to a customer unopened, and frequently under seal, and as the modern advertising puts it—"untouched by human hands." This is no longer an age when the processor puts the ingredients into a vial with an "eyedropper," with highly variable results appearing in the finished "preparation," but an era characterized by automatic mixing, measuring, and filling apparatus, the entire productive process being controlled by electronic and nucleonic gauges, measuring to infinitesimal precision, to produce an absolute result in meeting a required standard. This is the process that brings to a pharmacist an "exempt" prepara-

tion, properly labeled as required by statute, and in this case a label bearing an "X," specifically designed to make that preparation more quickly identifiable. In addition to the technical controls used to accomplish efficiency in production, as to the preparation and use of narcotics, both the federal and state governments have imposed statutory controls as noted above here in Ohio. It is emphasized that appropriate penalties for the violation of the regulations have been provided by the Legislature to make manufacturers and pharmacists "honest."

Counsel for defendant directs his attack on the testimony of the two pharmacists, used by the state, "the labels on the preparation," and the records kept by the pharmacy, with a sweeping charge that it was all "hearsay," and as to the labels at least a denial of the right of confrontation. This objection requires some consideration of the hearsay doctrine and a few of its multitudinous ramifications.

Many interesting facts concerning the history of the hearsay concept are provided by the text writers. There was a time, say the texts, when hearsay was received into evidence without question and that there "never has been a time when the courts of England or America rejected all hearsay evidence." (62 Harvard Law Review 177, 179, and 5 Wigmore on Evidence, 3 Ed., 9, Section 1364 [hereinafter reference will note only page and section number].) Only after the dangers inherent in hearsay receive emphasis do we find that an objection to hearsay resulted in its exclusion rather than its admission with the objection being allowed to stand as affecting the weight of the hearsay. Objections reflected the believed dangers, sometimes briefly labeled, vocabulary, sincerity, memory, and perception. Continued emphasis on the dangers produced the rigid rule denying admissibility.

The text writers seem to sense some prevailing and growing trends. Wigmore sees the future as providing relief from the "needless obstruction to investigation of truth caused by the hearsay rule." (Page 209, Section 1427.) That same authority looks hopefully for a "reformulation" of the hearsay rule that "would make it no

longer necessary to perpetuate the elaborate definition of the ensuing exceptions." (Page 215, Section 1427.)

As highly desirable as "re-formulation" and the elimination of "elaborate definition" in the exceptions would be, the ideals have not reached accomplishment, and such trends toward reform, as may be developing, are more by way of further exceptions. Some changes, exceptions perhaps, have been produced by practical impossibility "on grounds of mercantile inconvenience." (Page 366, Section 1521.) Illustrative are "regular entries," books and records, and the "shop-book rule." The suggestion comes that we need look for something which "is in the nature of a practicable substitute for the ordinary test of cross-examination." (Page 204, Section 1422.)

As the dangers inherent in hearsay loomed large, the doctrine of confrontation and cross-examination grew in importance as the device for testing the hearsay. Hearsay, confrontation, and the right to cross-examine are now all bound up together. So strong are these associated doctrines in our present day thinking that counsel quite commonly assert them as the conclusive objection from which no trial court can find a way to admit any evidence, however reliable and trustworthy, once the condemning word "hearsay" has been shouted. So strong is the urge to make that conclusive objection, that not infrequently counsel neglects to distinguish hearsay from the completely nonhearsay.

It must be emphasized that historically the hearsay rule related only to witnesses. Witnesses were inclined to relate not only what they knew themselves but what they had heard from others. Those others, beyond the reach of the court, could well produce the hearsay, "made without the sanction of an oath and without the declarant being under a responsibility to answer for the crime of perjury in making a wilful falsification." (15 Ohio Jurisprudence 2d 550, Section 377.)

In the instant case, there is no "witness" against whom the hearsay objection lodges. The testimony comes from "(possibly a bottle label)." Not possibly, specifically, counsel challenges the label and the record of nar-

cotic sales kept by the pharmacist in response to statutory requirement. If there be a culprit, it is the label, or the record, or both. Certainly the testimony of the druggist that his knowledge of the contents of the exempt narcotic preparation comes from the manufacturer's label is in no sense hearsay. It is a statement of fact, entirely within his own knowledge. It is not excludable as hearsay. There is no hearsay problem presented, and consequently, no right to confrontation and cross-examination is denied, or constitutional right violated. If the defendant has the basis for objection to the evidence, label and record, it must be predicated on something other than the hearsay rule.

But we return to the setting of the hearsay rule since the more recent trends toward liberality in the application of the rule arise out of, or are connected with, the basic and longer recognized exceptions to the rule, or ramifications thereof. There are many forms of evidence common to the trial of cases, for example, real or demonstrative evidence—objects, exhibits, documents, records, etc.,—none of which is subject to cross-examination to determine trustworthiness. Courts are obliged, as a practical matter, to use other and entirely different methods of substantiation.

At least one area, generally regarded by the authorities as an "exception" to the rule, has received legislative and judicial attention. The business records area reflects the more modern trends and has much to contribute in the solution of the problem here presented. The "[BUSINESS RECORDS AS EVIDENCE]" statute, Section 2317.40, Revised Code, resulted from that "mercantile inconvenience" concept advanced by Wigmore. In testing the reliability of this entirely different—non-people—evidence, Wigmore suggests what he talks about as "circumstantial probability of trustworthiness." The language used at page 204, Section 1422, is:

"* * * under certain circumstances the probability of accuracy and trustworthiness of statement is practically sufficient, if not quite equivalent to that of statements tested in the conventional manner. * * *"

And, as if to nullify an objection that there is no oath

and possible punishment for perjury, he suggests that "where, even though a desire to state falsely may casually have subsisted, more powerful motives to accuracy overpower and supplant it." (Page 369, Section 1522.)

In this case, the narcotics register upon which the state relied falls squarely within the area covered by Section 2317.40, Revised Code, as a business record, as well as meeting the requirements of the narcotics law. The testimony of the pharmacists establish it as such. The ramifications in the application of business-records-as-evidence statutes are evident from an examination of the indexes to text materials and annotations, such as found in 17 A. L. R. 2d 236. The older original entry concept appears to be diminishing in the face of the trend to the "made in the regular course" idea, which, as shown by the indexes, is being extended broadly, so that much thoroughly reliable and trustworthy evidence will escape the hangman's noose labeled hearsay. Ohio is developing a volume of case law in which application of the business records statute is significant. Hospital records, sales slips, ledgers, and check stubs, have been considered. One case, *Steiger* v. *Coca Cola Bottling Co.* (1939), 31 Ohio Law Abs. 215, is worthy of note. The Eighth District Court of Appeals held that statements of fact made by nurses in records approved by the American College of Surgeons, "are sufficiently worthy of credence and of sufficient trustworthiness to be admitted in evidence * * *." (Headnote.)

Two other Ohio cases deserve some attention. *State* v. *Phillips* (1951), 90 Ohio App. 44, held that:

"The Uniform Evidence Act relating to business records applies to criminal as well as civil procedure."

The Eighth District Court of Appeals held in *Halle Bros. Co.* v. *Cope* (1960), 165 N. E. 2d 25, that Section 2317.40, Revised Code, gives a trial court wide latitude in the application of its rule as to evidence presented before it.

"Mercantile inconvenience" has moved legislatures to limit or modify, or create another exception to, the hearsay rule by the business records act. History indicates, how-

ever, that the hearsay rule and all of its ramifications are largely court-made law. There is no reason why courts may not move to respond to that same ''inconvenience'' as to labels and narcotic records if they find ''circumstantial probability of trustworthiness.'' Certainly, modern methods of production control, packaging, etc., previously noted, supply that element of trustworthiness as to the ''label'' in this case as a ''witness.''

In the event that those affected think that such treatment of a label is a strain on judicial authority, attention is directed to our own business records section. It applies to every kind of business, including, therefore, the preparation and distribution of exempt narcotics. It applies to the record of an ''act, condition, or event,'' made in the regular course of business, at the time of the act. The label fits all of these provisions. Testimony as to the identity of the label and as to its mode of preparation and attachment to the container is more difficult to produce, but the manufacturer is obliged to attach his name, etc., to the label, under penalty of fine or imprisonment, which is sufficient to supply the necessary verification.

The labels in question are not hearsay, but if they are so regarded, they are an exception to the hearsay rule, as provided by the uniform-business-records statute, but, still further, they are real evidence, which could well have been used as an exhibit, and admitted as evidence, supported by circumstantial probability of trustworthiness.

It is difficult any time to determine just what the charge of a judge leads a jury to do. In the instant case it is unlikely that the court ''undoubtedly led the jury to believe'' that the defendant would be in trouble if he obtained any codeine in any amount within a 48-hour period since it told the jury in substantial detail the essentials of the applicable sections in its charge and reiterated in outlining the burden of proof resting upon the state. The most that can be said of the portion of the charge to which objection is made is that it is surplusage, but it is in no sense prejudicial, and we so hold.

As previously noted, perhaps incidentally, there was

no violation of defendant's constitutional rights under the Sixth Amendment to the Constitution of the United States and Section 10, Article I of the Constitution of Ohio. He was confronted by the witnesses, including his accuser, Stanley Grodell, who signed the affidavits charging him.

In passing, it is observed that if the defendant was without knowledge as to the prohibitions contained in the sections under which he was charged, and in search of "cough medicine," with no intent to violate the narcotics laws, such defense could properly have been made. No defense having been offered, the trier of the facts may infer the intent from the defendant's conduct.

Even admitting severity of punishment under the narcotics act as claimed by the defendant, it is a matter primarily for the Legislature, and, in the instant case, at this time, the defendant has not been subjected to cruel and unusual punishment and cannot, therefore, say that the penalties provided are unconstitutional as to him. The record shows that imposition of sentence has been suspended and the defendant placed on probation for two years.

Defendant's assignments of error are not well taken and are, therefore, overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH and LEACH, JJ., concur.