STATE of Iowa, Appellee,

v.

Lance Troy HEUSER, Appellant.

No. 01–2027.

Supreme Court of Iowa.

May 7, 2003.

Linda Del Gallo, State Appellate Defender, and Nan Jennisch, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Timothy N. Schott, County Attorney, and Stephen J. Lickiss, Assistant County Attorney, for appellee.

STREIT, Justice.

A man claims his allergies drove him on a shopping spree to three different stores to buy cold medication and lithium batteries. Lance Heuser was convicted of two counts of possession of a precursor with intent to manufacture methamphetamine.

Heuser argues the police officers did not have reasonable cause to stop the van in which Heuser and his companion were driving and there was insufficient evidence to support the convictions. Heuser also contends the trial court erred in admitting the labels on the cold medication boxes and batteries. Finally, Heuser asserts his trial counsel was ineffective for not allowing him to testify on his own behalf. Because there was reasonable cause to stop the van, the labels are admissible, trial counsel was not ineffective, and there was sufficient evidence to support the jury's convictions, we affirm.

## I. Background and Facts

A Target store employee notified police that two people had purchased numerous packages of over-the-counter cold medication containing pseudoephedrine hydrochloride. The employee gave the police a description of the man and woman, the van they were driving, and the license plate number. The police located the van at Wal–Mart where they saw the woman go into Wal–Mart and come out with her purchases. The couple then drove to Walgreens. The man went into the store. The police contacted the store and asked what the man bought. The employee saw the man purchase several boxes of cold medication containing pseudoephedrine hydrochloride and ask about lithium batteries. The police stopped the van a short time later. The man was identified as Lance Heuser.

The woman consented to a search of the van. Inside, the police found eight packages of various cold medications and several loose blister packs of medicine. In total, the officers found 312 tablets containing ephedrine or pseudoephedrine hydrochloride. The police also found twelve AA Energizer lithium batteries. Heuser and his companion were each charged with two counts of possession of a precursor with intent to manufacture methamphetamine in violation of Iowa Code sections 124.401(4)(a), (b), (f) (2001).

Heuser gave explanations for his possession of the cold medication and lithium batteries. After the couple gave conflicting stories about their shopping spree, Heuser explained the cold medication was for his personal use. He claimed he needed the medicine for his allergies but offered no reason for why he needed so much. Heuser's companion said she, too, had very bad allergies and needed the medication. As to the AA batteries, Heuser said he bought them that day at Kmart for a smoke detector he had with him in the van. However, the smoke detector required a nine-volt battery.

Heuser filed a motion to suppress all of the evidence the officers found during the search of the van. The court denied Heuser's motion. During trial, over Heuser's objections, the State offered into evidence the labels from the boxes of cold medication and the batteries. Though characterizing the labels as hearsay, the State argued the labels are admissible hearsay under the residual exception to the hearsay rule. *See* Iowa R. Evid. 5.803(24). Heuser objected to the admission of these labels asserting the labels did not fit within any of the exceptions to the hearsay rule. The district court concluded the labels should be admitted under the "market reports, commercial publications" exception of Iowa Rule of Evidence 5.803(17). Heuser appeals.

## II. Merits

Heuser asserts the trial court erred in denying his motion to suppress for lack of reasonable cause to stop the van. He contends the court erred in admitting the labels because they are inadmissible hearsay and impinge upon his constitutional

right of confrontation. Heuser also argues there was insufficient evidence to support his convictions. Finally, he contends his trial counsel was ineffective for not allowing him to testify on his own behalf. We address each argument in turn.

## A. Legality of the Stop

■ Heuser argues the trial court erred in overruling his motion to suppress the evidence obtained from the stop of the vehicle. At the suppression hearing, Heuser argued the police did not have reasonable cause to stop the van and did not have consent to search the vehicle. On appeal, Heuser only challenges the court's refusal to suppress the evidence based upon lack of reasonable cause. We review the district court's denial of Heuser's motion to suppress de novo because Heuser asserts his constitutional rights were violated when the officers allegedly stopped the van without reasonable cause. *See State v. Wells*, 629 N.W.2d 346, 351 (Iowa 2001).

■ The Fourth Amendment of the United States Constitution requires reasonable cause to stop a person for investigation. *State v. Heminover*, 619 N.W.2d 353, 357–58 (Iowa 2000) (*overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n. 2 (Iowa 2001)). The main reason law enforcement may stop a person "is to resolve the ambiguity as to whether criminal activity is afoot." *State v. Richardson*, 501 N.W.2d 495, 497 (Iowa 1993). The United States Supreme Court has said reasonable cause may exist even when there is no probable cause for an arrest. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968); *State v. Donnell*, 239 N.W.2d 575, 577 (Iowa 1976). Once a defendant challenges the legality of an officer's stop, the State has the burden to show the officer had "specific and articulable cause to reason-

ably believe criminal activity [was] afoot." *Heminover*, 619 N.W.2d at 358.

Before the police officers stopped the van, the officers were faced with three major levels of suspicion. The Fort Dodge police department had been working with several area stores, including Target and Wal–Mart, to identify people buying precursors of methamphetamine. The first level of suspicion arose when Heuser and his companion bought several boxes of cold medication at Target. The couple entered the store together but separated and bought pseudoephedrine at different cash registers before returning to the van. As the Target employees' suspicions were piqued, they notified police. The level of suspicion ascended to a higher plane as the couple proceeded from Target to Wal–Mart. At each stop, Heuser traded places with his companion in driving the van, so as to alternate the person purchasing the medication. At Wal–Mart, the woman got out of the driver's side of the van and Heuser moved from the passenger side to the driver's side. His companion went into the store alone, made a purchase, and returned to the van. A third level of suspicion occurred when the couple drove to Walgreens where Heuser bought more cold medication and asked a Walgreens' employee about lithium batteries. With each stop and purchase of cold medication and batteries, Heuser climbed up the ladder of reasonable cause.

The United States Supreme Court has said police must "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740, 749–50 (2002). The manufacturing process for methamphetamine requires pseudoephedrine hydrochloride and

lithium. The officers testified it is common for people to obtain pseudoephedrine hydrochloride from over-the-counter cold medications. They use batteries for the lithium in the manufacturing process. The officers testified Heuser's conduct was consistent with people engaged in the manufacture of methamphetamine who generally try to avoid suspicion by gathering cold medication and batteries from a number of stores.

■ This is not a case where a person possessed only a large amount of cold medication *or* only a number of lithium batteries. Rather, Heuser possessed an unusually large number of pills. In addition to the pills, the officers had reasonable cause to suspect Heuser also possessed lithium batteries. These facts coupled with Heuser's suspicious conduct of driving from store to store gathering medication and switching-off with his companion to buy the pills formed a solid basis upon which the officers had reasonable cause to stop the van to determine "whether criminal activity [was] afoot." *See Richardson,* 501 N.W.2d at 497; *see also Heminover,* 619 N.W.2d at 358 (State has burden to prove officer has "specific and articulable cause to reasonably believe criminal activi-

ty [was] afoot."). We affirm the trial court's denial of Heuser's motion to suppress the evidence.

**B. Hearsay Evidence**

■ The State offered into evidence the labels from the boxes of cold medication and the batteries found in Heuser's van. The cold medication labels said the medication contained "pseudoephedrine hydrochloride." The batteries were labeled classifying them as "lithium batter[ies]." Heuser objected to this, arguing the labels and batteries constituted inadmissible hearsay. The court admitted the labels under the "market reports, commercial publications" exception to the general prohibition against hearsay evidence. *See* Iowa R. Evid. 5.803(17). On appeal Heuser argues the court's admission of the labels and batteries prejudiced him because they were the only evidence offered to prove the cold medications and batteries contained precursors to methamphetamine.[1] We review the trial court's admission of hearsay evidence for correction of errors of law. *State v. Curry,* 436 N.W.2d 371, 372 (Iowa Ct.App.1988). However, to the extent constitutional issues are raised, our review is de novo. *Id.*

1. Heuser also argues the hearsay is inadmissible because the State did not give notice of its intention to offer the labels into evidence "sufficiently in advance of the trial." *See* Iowa R. Evid. 5.803(24). Before the court may admit evidence offered pursuant to Iowa Rule of Evidence 5.803(24), the residual hearsay exception, the court must determine that: (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. *Id.* Additionally, the court may not admit a statement pursuant to this section unless the proponent of it makes known to the adverse party sufficiently in advance of trial ... to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant. *Id.* The only hearsay exception which requires adequate notice to be given to the adverse party is the residual hearsay exception. In this particular case, the trial court admitted the labels into evidence pursuant to the "market reports, commercial publications" exception to hearsay under Iowa Rule of Evidence 5.803(17). As such, the notice requirement does not apply to this case.

■ Hearsay is an out-of-court statement made by one, other than the declarant, testifying at a trial or hearing to prove the truth of the matter asserted. Iowa R. Evid. 5.801(*c*). As a general rule, hearsay is not admissible. The Confrontation Clause of the United States Constitution permits hearsay evidence to be admitted against the defendant only where the evidence falls within a recognized hearsay exception or particularized guarantees of trustworthiness assure the reliability of the evidence. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). These exceptions exist to accommodate "situations where it is impossible or impractical to present an actual witness, yet the proffered necessary evidence is inherently trustworthy under the circumstances." 5 John Henry Wigmore, *Evidence* § 1420, at 251 (rev. ed.1974).

In the case before us, the trial court found the labels were hearsay but admitted them under an exception to the hearsay rule. The court relied upon the exception for "market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." Iowa R. Evid. 5.803(17). Assuming the labels may be regarded as hearsay, we must determine whether they are admissible under any exceptions to the hearsay rule.

The issue of whether the labels on the boxes of over-the-counter cold medication and batteries come within an exception to the general rule against hearsay is a matter of first impression in Iowa. In arguing the cold medication labels fall within one of the exceptions to hearsay, the State has cited an analogous California case dealing with the admissibility of the label from a spray paint can. *See In re Michael G.*, 19 Cal.App.4th 1674, 24 Cal.Rptr.2d 260 (1993). In *In re Michael G.*, the State attempted to prove the defendant was in possession of a substance containing toluene with intent to inhale for the purpose of intoxication. The applicable California exception to the hearsay rule was similar to Iowa's "market reports, commercial publications" exception, providing:

> Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business....

*Id.* at 262 n. 1. On appeal, the court found the label was inherently reliable because the manufacturer would have no incentive to state the product contains substances that it does not. *Id.* at 262. The court took judicial notice of the public's reliance on the label and held the lower court properly admitted the label under the compilation exception to the hearsay rule. *Id.*

More recently, the Appellate Court of Illinois addressed the very issue we have before us. *See People v. Shevock*, 335 Ill.App.3d 1031, 270 Ill.Dec. 390, 782 N.E.2d 949 (2003). The court held the labels from Sudafed packages were admissible as an exception to the hearsay rule. *Id.* at 953–54. The court stated the label was required, subject to penalty, under state and federal law. *Id.* at 954. The court noted violations of the Illinois Food, Drug and Cosmetic Act would result in criminal punishment and destruction of the product. *Id.* Given the fact the Sudafed had been purchased by the defendant, it was in his possession, and the contents were in the original package, the opportunity for tampering or adulteration of the product was reduced. *Id.* (citing *In re T.D.*, 115 Ill.App.3d 872, 71 Ill.Dec. 20, 450 N.E.2d 455, 459 (1983)). These combined circumstances made the label admissible in spite of the hearsay rule. *Id.*

In the instant case, the pseudoephedrine hydrochloride tablets found in the van are controlled by state and federal law. The Iowa Drug, Device, and Cosmetic Act regulates drugs introduced into commerce. It specifically prohibits the introduction into commerce of any drug that is mislabeled. *See* Iowa Code §§ 126.2(8) (defining the word "drug"), 126.2(11) (defining the word "label"), 126.3(1) ("the introduction or delivery for introduction into commerce of any drug, device, or cosmetic that is adulterated or misbranded" is unlawful). Iowa Code section 126.10 addresses the misbranding or mislabeling of drugs. This section provides a drug label must contain "an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count." *Id.* § 126.10. The label must also bear the "systematic chemical name or the chemical formula" including the established name of the drug and the quantity of each active ingredient. *Id.* § 126.10(5)(*a*)(1). Similarly, section 714.8 prohibits misrepresenting the quality or quantity of any goods offered or kept for sale by attaching or altering a label. *Id.* § 714.8. These sections apply to the labels from the cold medication boxes offered into evidence by the State. Furthermore, the medication inside the boxes is subject to the regulations of the Food and Drug Administration. The applicable state and federal regulations suggest the cold medication labels are accurate and trustworthy. Additionally, the contemporary nature of pharmaceutical practice exemplifies the inherent trustworthiness of the cold medication labels.

In this modern day, thousands of pharmaceuticals are compounded, processed, or produced, and then packaged and labeled for distribution in that package for direct sale to a customer unopened, and frequently under seal, and as the modern advertising puts it "untouched by human hands." This is no longer an age when the processor puts the ingredients into a vial with an "eyedropper," with highly variable results appearing in the finished "preparation," but an era characterized by automatic mixing, measuring, and filling apparatus, the entire productive process being controlled by electronic and nucleonic gauges, measuring to infinitesimal precision, to produce an absolute result in meeting a required standard. This is the process that brings to a pharmacist an "exempt" preparation, properly labeled as required by statute, and in this case a label ... specifically designed to make that preparation more quickly identifiable.

*State v. Mitchell*, 18 Ohio App.2d 1, 246 N.E.2d 586, 589 (1969). For all these reasons, over-the-counter drug labels are generally used and relied upon as accurate.

■ The labels in question were required on the cold medication boxes as provided by state and federal law. Heuser possessed the boxes of cold medication that were in the original packages. Both the boxes and the blister packs were unopened. The fact the pills were in the original, unbroken packages indicates the contents had not been changed since the manufacturer packaged them. The cold medication clearly listed pseudoephedrine hydrochloride as one of the active ingredients in each pill. Although the loose blister packs were not in the original boxes, the pack clearly indicated each pack contained Perrigo brand nasal decongestant, containing pseudoephedrine hydrochloride. The labels qualify as a "market list" that is generally used and relied upon by the public. The list comes within the purview of the market reports, commercial publications exception to the hearsay rule. Under this exception, the trial court properly admitted the cold medication labels into evidence as proof the contents contained

pseudoephedrine hydrochloride, a precursor to methamphetamine.

The batteries are not subject to the requirements of Iowa Code chapter 126 because they do not fall within the scope of the Drug, Device, and Cosmetic Act. Instead, the court admitted the battery labels into evidence under the same hearsay exception as the cold medication labels and pursuant to our holding in *State v. Beiser,* 248 Iowa 728, 732, 82 N.W.2d 115, 117 (1957). In *Beiser,* the court found the labels on beer bottles supported the conclusion that beer had the alcoholic content specified by statute because the statute required the labels to state the alcohol concentration. The bottles were labeled "beer" and sold as containing beer; consumers have a right to rely on the truth of the label. *Id.*

■ The Energizer batteries in Heuser's possession were clearly labeled "AA lithium batter[ies]." There is nothing in the record to suggest the battery labels indicating they contained lithium were untrustworthy or had been altered from their original form. Heuser admits he purchased the batteries the same day he was arrested indicating the batteries were new and still contained active lithium. Further, Heuser conceded he bought the batteries in reliance on the labels which stated the batteries contained "lithium." Energizer Company manufactures the lithium batteries, labels them as lithium batteries, and sells them as lithium batteries. A manufacturer would be unlikely to proclaim the batteries contain lithium when they do not. The public relies on that assertion. The label has strong indicia of trustworthiness. The words "AA lithium battery" on the surface of each battery come within the

purview of the "market list" exception to hearsay as the label puts the battery into a specific category, i.e. lithium batteries. The trial court properly admitted the battery labels into evidence for the purpose of showing the batteries contained lithium, an ingredient required for the manufacture of methamphetamine.

■ In sum, all of the above circumstances combine to make the labels on the batteries and cold medication boxes admissible. The "writing on a product's label is competent proof of its contents and is self-authenticating."[2] *See Shevock,* 270 Ill. Dec. 390, 782 N.E.2d at 954; *accord In re T.D.,* 71 Ill.Dec. 20, 450 N.E.2d at 458; *Mitchell,* 246 N.E.2d at 589; *Wirth v. State,* 55 Wis.2d 11, 197 N.W.2d 731, 733 (1972). The labels found on the boxes and batteries were properly admitted into evidence under the "market reports, commercial publications" exception as substantive proof that the boxes contained pseudoephedrine and the batteries contained lithium. *See* Iowa R. Evid. 5.803(17); *In re T.D.,* 71 Ill.Dec. 20, 450 N.E.2d at 458; *Mitchell,* 246 N.E.2d at 589; *Wirth,* 197 N.W.2d at 733. We affirm.

## C. Sufficiency of the Evidence

■ Heuser argues the trial court erred in overruling his motion for judgment of acquittal because there was insufficient evidence to support his convictions. We review the record for correction of errors of law. *State v. Thomas,* 561 N.W.2d 37, 39 (Iowa 1997). Substantial evidence is that from which a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt.

2. *See* Iowa R. Evid. 5.902(7) ("Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to ... inscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership and control.").

*Id.* Our review of the record shows ample evidence supporting Heuser's convictions.

The State was required to show Heuser possessed pseudoephedrine hydrochloride and lithium batteries with intent to manufacture methamphetamine. Intent may be shown through circumstantial evidence and inferences drawn from the evidence. *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995). The facts before us circumstantially prove Heuser had intent to manufacture methamphetamine.

Heuser possessed an unusually large amount of the drug—312 tablets. Heuser's excuse that he needed the medication for his allergies is not consistent with the large number of tablets he had in the van. The directions for each of the medications said the maximum dose is four tablets per day. In addition to the cold medication, Heuser also had twelve AA lithium batteries in the car. He explained the batteries were for his 9–volt smoke detector.

Heuser's conduct suggests he intended to use the medication and batteries to manufacture methamphetamine. He traveled from Target to Wal–Mart to Walgreens to buy the pseudoephedrine. At the first store, Heuser and his companion split up and each bought cold medication from separate cashiers. At the next store, only the woman went into the store to buy the medicine. Finally, at their last stop, only Heuser went into the store to purchase more medicine and he asked about lithium batteries. Such behavior is consistent with a person trying to avoid suspicion by buying the necessary methamphetamine precursors from a number of different stores. When the police questioned the couple about their activities, Heuser initially said they were shopping for pantyhose. The woman told the officers they were not shopping for pantyhose. Heuser did not acknowledge the cold medication and batteries in the car

until after the police discovered them during the search. From all of the above facts, the jury could have concluded Heuser possessed lithium batteries and pseudoephedrine hydrochloride with intent to manufacture methamphetamine.

## D. Ineffective Assistance of Counsel

Finally, Heuser contends his trial counsel was ineffective for failing to allow Heuser to testify on his own behalf. Heuser specifically argues that had he been permitted to testify, he would have explained the lithium batteries found by the police were for his childrens' compact disc players.

To prove ineffective assistance of counsel, Heuser must show: (1) trial counsel failed to perform an essential duty and (2) Heuser was prejudiced by counsel's errors. *State v. Polly*, 657 N.W.2d 462, 465 (Iowa 2003). We begin with a presumption that trial counsel acted within the normal range of competency. *Id.* To show prejudice Heuser must prove that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Failure to prove either of these elements is fatal to a claim of ineffective assistance. We review such claims de novo. *Id.*

An ineffective assistance of counsel claim generally does not lie for the exercise of judgment. *Polly*, 657 N.W.2d at 465 (citing *State v. Hischke*, 639 N.W.2d 6, 8 (Iowa 2002)). "Generally, the decision not to call a particular witness or the defendant to testify implicates a reasonable tactical decision." *Polly*, 657 N.W.2d at 468. "Improvident trial strategy or miscalculated tactics" typically do not constitute ineffective assistance of counsel. *Id.* (citing *State v. Oetken*, 613 N.W.2d 679, 684 (Iowa 2000)). Trial counsel's decision not to call Heuser to testify was a strate-

gical decision we will not second-guess. *Id.* (citing *State v. Kone*, 557 N.W.2d 97, 102 (Iowa Ct.App.1996)).

 The record does not indicate whether Heuser's trial counsel advised him not to testify, but the record reflects tactical reasons for such action. The State likely would have impeached Heuser's credibility with his dubious and inconsistent explanations for his possession of the cold medication and batteries. For example, the State certainly could have asked Heuser about the newest explanation for his possession of the lithium batteries. Heuser may have been asked why, at trial, he claimed the batteries were for compact disc players, when he had told the police officers the batteries were for a smoke detector. The State was armed with numerous inconsistent statements to use for impeachment purposes. Because Heuser has not shown his trial counsel failed in an essential duty, his ineffective assistance of counsel claim fails.

### III. Conclusion

We affirm all judgments of the trial court. First, we conclude the trial court properly overruled Heuser's motion to suppress for lack of reasonable cause. The circumstances surrounding the police officer's stop of the van, coupled with the officers' experience provided reasonable cause to believe criminal activity was afoot. The trial court also properly admitted into evidence the labels on the cold medication boxes and batteries pursuant to the exception for "market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." Iowa R. Evid. 5.803(17). The record contains substantial evidence upon which the jury could have found Heuser guilty of two counts of possession of a precursor with intent to manufacture

methamphetamine. Finally, Heuser's trial counsel was not ineffective for failing to call Heuser to testify. This decision reflects a reasonable tactical decision.

**AFFIRMED.**