# IN THE COURT OF APPEALS OF IOWA

No. 19-1052
Filed January 21, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**PATRICK BRACY,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Marshall County, John J. Haney,

Judge.

        Patrick Bracy appeals from his convictions for drug-related offenses,

arguing the denial of his motion to suppress was in error. **AFFIRMED.**

        Martha J. Lucey, State Appellate Defender, and Shellie Knipfer, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee.

        Considered by Bower, C.J., and Doyle and Schumacher, JJ.

**SCHUMACHER, Judge.**

Patrick Bracy appeals his convictions for eight counts of drug-related offenses. Bracy argues the magistrate's issuance of a search warrant was unsupported by probable cause and therefore the denial of his motion to suppress the evidence resulting from the search was in error. In reviewing the totality of the information contained in the warrant application, we find the issuing magistrate had a substantial basis for concluding that probable cause existed, and we affirm.

## I. Background and Prior Proceedings

In August 2018, Marshalltown police detective Dane Bowermaster received information from two individuals that Bracy was dealing methamphetamine. Unrelated to this information, Bracy was arrested on an outstanding warrant on September 4, 2018. After Bracy's arrest, two additional individuals alleged Bracy was involved in methamphetamine dealing. While incarcerated, Bracy made two recorded jailhouse phone calls referencing items stored at the house he had been staying at with his father.

Detective Bowermaster searched Bracy's criminal history and learned Bracy had two prior drug convictions, one of which was less than two years old. Based on his initial investigation, Detective Bowermaster applied for and obtained a warrant for the search of the residence, its outbuildings, and specified vehicles ordinarily found on the premises. The application included the following eleven statements from Detective Bowermaster:

> (1) On 5/23/18 at approximately 1031 hrs, Pat Bracy was cited for [driving under suspension] while driving a white 2001 Mazda

Tribute, . . . registered to Samantha Million. This vehicle was re-registered on 5/30/18 to Donald Bracy[1] . . . , with a new plate . . . .

(2) During the second week in August 2018 I had contact with a criminal defendant known as CD1. CD1 told me that they knew Pat Bracy to be a large level meth dealer, who was in possession of multiple ounces of methamphetamine. CD1 told me that Pat lived on Linn St and was able to take me to the [area where the house is located] and pointed out a possible house where Pat lived. CD1 was not certain which house was Pat's at this time. CD1 stated that Pat was living with his father. I know Pat's dad to be Donald Bracy . . . . After meeting with CD1, I looked into the Marshalltown Police Department[']s records and found that Pat had his address listed . . . . At this time I was able to see a white 2001 Mazda Tribute, . . . registered to Donald Bracy, in the driveway [of that house].

(3) A check of Pat's criminal history shows the following:

 - Possession with intent controlled substance violation conviction on 8/18/14

 - Carrying weapons violation 10/13/15

 - Possession of a controlled substance (meth) conviction on 1/13/17

(4) During the 3rd week in August 2018 I met with another criminal defendant known as CD2. CD2 told me that they also knew Pat to be a meth dealer moving anywhere from ounce to pound level quantities. CD2 told me that Pat was living at . . . his father's house. CD2 was able to take my [sic] by and identify Pat's house. CD2 identified [the house] as Pat's residence.

(5) On 8/27/18 I observed Pat exit the rear door of the house . . . , walk over toward the garage briefly and then walk back into the residence. During this time I also observed a white 2001 Mazda Tribute, . . . in the driveway . . . .

(6) On 8/30/18 Pat was involved in an incident which he fled on foot from [sic]. The investigating officers found the white 2001 Mazda Tribute, . . . registered to Donald Bracy, parked outside the address where the incident occurred and believed Pat drove it there.

(7) Pat was arrest[ed] for outstanding warrants on 9/4/18. During this arrest Pat was with Maria Vargas Cervantes . . . and they were both in a Red 2001 Ford F150, . . . registered to Donald Bracy . . . . During the arrest of Pat, Pat disclosed he was not employed.

(8) During the 2nd week in September, Officer Hoyt with the Marshalltown Police Dep[artment] had contact with a concerned citizen that will be known as CC1. CC1 told Officer Hoyt that Pat was a meth dealer and knew Pat was in possession of large quantities of meth (multiple ounces) a few days before Pat's arrest on 9/4/18. CC1 also said that they heard [sic]

---

[1] Donald Bracy is Bracy's father, who we will refer to as Donald.

(9) On 8/8/18 I received information from a concerned citizen now known as CC2. CC2 told me that after Pat's arrest on 9/4/18, CC2 heard that Pat had left pound quantities of meth behind.

(10) On 9/10/18 at approximately 1110 hrs, I listened to a phone call from Bracy at the jail to a person who I believe is Donald Bracy . . . . During this phone call Pat said "don't let nothing happen to my safe man. There is a lot of money in that safe. That's where everything is."

(11) On 9/10/18 at approximately 2130 hrs, Pat placed a call . . . and speaks to a female who he refers to as Maria. A check of the Marshall County Records shows that [the number] belongs to Maria Vargas-Cervantes as of September of 2018. The female tells Pat "do you know how much shit I have gone through to get your debt paid off?" Pat then says "it's like I told him, all that shit is right there from my dad[']s house." I know from experience that people often refer to meth as "shit."

The warrant was presented to a magistrate and approved. After procuring the search warrant, Marshalltown police executed the warrant on September 11, 2018. Cervantes and Donald were present. The search resulted in the discovery of cell phones; digital storage devices; scales; bongs; pipes; and various containers of psilocybin mushroom, prescription drugs, marijuana, methamphetamine, and a possible drug-cutting agent. Approximately one half-pound of methamphetamine was seized.

The State charged Bracy with eight counts of drug-related offenses: Count I, possession of a controlled substance with intent to deliver; Counts II–V, possession of a controlled substance, third offense; Count VI, failure to affix a drug tax stamp; Count VII, prohibited acts; and Count VIII, unlawful possession of a prescription drug. The State also sought a sentencing enhancement under Iowa Code section 902.8 (2018).

On March 13, 2019, Bracy filed a motion to suppress the evidence seized pursuant to the execution of the search warrant, arguing the warrant application

lacked probable cause. The trial court found the application and the sworn testimony in support of the application established the credibility of the informants or their information. It cited Detective Bowermaster's corroboration of portions of the tips, Bracy's criminal history, and jailhouse phone calls.

After waiving his right to a jury trial on May 9, 2019, Bracy's trial was held on the minutes of testimony on May 17, 2019, and the court adjudicated Bracy guilty of all eight counts and applied the sentencing enhancement. Bracy appeals.

## II. Standard of Review

We review challenges to a district court's denial of a motion to suppress evidence de novo. *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). Normally, under de novo review we "make an independent evaluation of the totality of the circumstances as shown by the entire record." *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001) (quoting *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *Id.*

However, where a motion to suppress alleges that a magistrate's finding of probable cause to search was erroneous, on review of the denial of the motion "our task is not to make an independent determination of probable cause, but only to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed." *State v. Green*, 540 N.W.2d 649, 655 (Iowa 1995) (cleaned up); *accord Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) ("The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." (cleaned up)). "[W]e examine only the information actually presented to the judge." *State v. McNeal*, 867 N.W.2d 91, 99

(Iowa 2015). "Close cases must be resolved in favor of upholding warrants, as public policy is promoted by encouraging officers to seek them." *Green*, 540 N.W.2d at 655. Furthermore, "we draw all reasonable inferences to support the judge's finding of probable cause." *State v. Gogg*, 561 N.W.2d 360, 364 (Iowa 1997).

### III. Constitutional Framework

Bracy argues his rights were violated under the Fourth Amendment of the United States Constitution and under article I, section 8 of the Iowa Constitution. He notes that the language of the Iowa Constitution is "relatively identical" to that of the United States Constitution, and he asserts that the analysis under either constitution "leads to the same conclusion" that reversal is required. Where a party makes no argument that the Iowa Constitution and the United States Constitution should be interpreted differently, we assume they "should be interpreted in an identical fashion." *State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008). "Even in cases where no substantive distinction has been advanced by the parties, we reserve the right to apply the principles differently." *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 76 n.3 (Iowa 2010).

Here, although it is clear Bracy seeks the protection of both constitutions, he makes no clear argument that the Iowa Constitution should be interpreted differently from the United States Constitution. We, therefore, assume the analysis under either is the same. *See Wilkes*, 756 N.W.2d at 842 n.1.

### IV. Discussion

A search warrant must be supported by probable cause. U.S. Const. amend. IV; Iowa Const. art. 1 § 8. "The test for probable cause is whether a

reasonably prudent person would believe that a crime has been committed on the premises to be searched or evidence of a crime is being concealed there." *Green*, 540 N.W.2d at 655. "Probable cause to search requires a probability determination that '(1) the items sought are connected to criminal activity and (2) the items sought will be found in the place to be searched.'" *Gogg*, 561 N.W.2d at 363 (quoting *United States v. Edmiston*, 46 F.3d 786, 789 (8th Cir. 1995)). On our review, acknowledging that such is a close call, we hold the magistrate had a substantial basis for concluding that probable cause existed.

We begin by considering whether there was a nexus between the items to be seized and Bracy's residence. "Although a nexus must be established between the items to be seized and the place to be searched, direct observation is not required." *McNeal*, 867 N.W.2d at 103 (quoting *State v. Groff*, 323 N.W.2d 204, 212 (Iowa 1982)). This nexus between criminal activity, the items to be seized, and the place to be searched "can be found by considering the type of crime, the nature of the items involved, the extent of the defendant's opportunity for concealment, and the normal inferences as to where the defendant would be likely to conceal the items." *Id.* (quoting *Groff*, 323 N.W.2d at 212). We find the nexus satisfied here. *See State v. Godbersen*, 493 N.W.2d 852, 855 (Iowa 1992) ("It is reasonable to assume that persons involved with drug trafficking would keep evidence—drugs, weighing and measuring devices, packaging materials and profits—at their residences."). The information obtained by the officer reflected that the defendant was residing at his father's home, which was the address listed in the warrant. We find a nexus between the items sought in the warrant and Bracy's home and vehicles.

In the application, Detective Bowermaster supported his request by describing four individuals who supplied information to Bowermaster, two of whom were concerned citizens and two of whom were criminal defendants. The application also included a reference to two of Bracy's jailhouse calls and Bracy's prior criminal history. The application also cited Detective Bowermaster's own training and experience, as well as his observations and corroborations of the citizens' and defendant's information.

Bracy disagrees that probable cause is supported by the application's contents. He argues the anonymous tips lacked sufficient indicia of reliability to be supportive of probable cause. He contends the jailhouse calls were minimally informative because they merely reveal his desire to keep money secure and generalized references to belongings—that the State allegedly misconstrues as coded language for methamphetamine. He asserts that the relevance of his prior criminal history has faded with time, and he insists that Detective Bowermaster's observations in light of his training and experience cannot reasonably support probable cause.

### A. Anonymous tips and confidential informants

Under Iowa Code section 808.3(2), "The application or sworn testimony supplied in support of the application must establish the credibility of the informant or the credibility of the information given by the informant."

"In the context of anonymous tips, we recognize a rebuttable presumption that information imparted by a citizen informant is generally reliable." *McNeal*, 867 N.W.2d at 100 (cleaned up). "However, an anonymous tip alone does not ordinarily contain sufficient indicia of reliability to provide probable cause." *Id.* at

100–01. Significantly, corroborated tips will be sufficient. *Id.* at 101. We apply a higher standard of proof "when weighing the reliability of tipsters who act for money, leniency or some other selfish purpose than when considering the reliability of the citizen informer whose only motive is to help law officers in the suppression of crime." *State v. Weir*, 414 N.W.2d 327, 331 (Iowa 1987).

The first individual, identified as CD1, told Detective Bowermaster, "they knew Pat Bracy to be a large level meth dealer, who was in possession of multiple ounces of methamphetamine." CD1 accompanied Detective Bowermaster to identify the area in which Bracy lived with his father. Bowermaster later searched public records to confirm the address of Bracy's father, which was in that area.

The second individual, identified as CD2, told Detective Bowermaster "that they also knew Pat [Bracy] to be a meth dealer moving anywhere from ounce to pound level quantities." CD2 noted that Bracy lived with his father and was able to identify the precise house in which Bracy lived.

The third individual, identified as CC1, told a Marshalltown police officer "that Pat [Bracy] was a meth dealer and knew Pat was in possession of large quantities of meth (multiple ounces) a few days before Pat's arrest on 9/4/18."

The fourth individual, identified as CC2, told Detective Bowermaster that he or she "heard that Pat [Bracy] had left pound quantities of meth behind" following his September 4, 2018 arrest.

Concerning the informants' credibility, both parties point to the Iowa Supreme Court's decision in *Weir*, 414 N.W.2d at 332, where the court identified factors to be considered in determining the credibility of an informant: "whether the informant was named"; "the specificity of facts detailed by the informant"; "whether

the information furnished was against the informant's penal interest"; "whether the information was corroborated"; "whether the information was not public knowledge"; "whether the informant was trusted by the accused"; "and whether the informant directly witnessed the crime or fruits of it in the possession of the accused."[2]

We acknowledge that certain aspects of the concerned citizens' credibility were not known; some of the *Weir* factors are not strongly supported by the warrant application.  It is unclear from the warrant application whether Detective Bowermaster or any member of the Marshalltown Police Department knew the identities of CC1 and CC2.  Furthermore, we are unable to ascertain the motivations of CC1 and CC2, as no explanation was provided for why Detective Bowermaster classified them to be concerned citizens.  Detective Bowermaster merely says, "Officer Hoyt . . . had contact with a concerned citizen that will be known as CC1" and that he "received information from a concerned citizen now known as CC2."  By not labeling CC1 and CC2 as criminal defendants, we assume they were not incarcerated or charged with offenses, but we cannot discern whether they received any benefit for their information.  We also note that some portions of what CC2 told Detective Bowermaster contain hearsay.  CC2 merely

---

[2] Prior to the 1998 amendment to section 808.3, the section required specific credibility determinations.  *See* 1998 Iowa Acts ch. 1117, § 1 (removing requirement that a magistrate "shall include a determination that the information appears credible").  Today, section 808.3 requires the testimony in support of the application to establish the credibility of the informant or the credibility of the information given by the informant.  *State v. Robbins*, No. 16-1694, 2018 WL 1433525, at *2 (Iowa Ct. App. Mar. 21, 2018).

*heard* that Bracy had left methamphetamine behind following his arrest on September 4, 2018.

The information provided by the criminal defendants—at least, as detailed in the warrant application—specified little more than the general claim that Bracy was involved in methamphetamine dealing. One of the more detailed statements to this effect was simply that Bracy was "moving anywhere from ounce to pound level quantities" of methamphetamine. Detective Bowermaster asserted in the warrant application that CD1, CD2, and CC1 all "knew" Bracy was involved in methamphetamine dealing; however, the basis of the knowledge of any informant is not contained in the warrant.

We have no information regarding whether any of the four informants furnished information against their "penal interest" or whether they were "trusted by the accused," or whether they "directly witnessed the crime or fruits of it in the possession of the accused." *See Weir*, 414 N.W.2d at 332.

Detective Bowermaster was able to corroborate some aspects of the information. He corroborated CD1's knowledge that Bracy lived with his father and CD1's correct naming of the particular street. He was able to corroborate CD2's knowledge of the precise address at which Bracy was living. He corroborated none of the information provided by either CC1 or CC2, and, as Detective Bowermaster had personal knowledge that Donald was Bracy's father, CD1 and CD2's identification of Donald as such was information that the detective already knew.

Aside from his discovery that Bracy had a prior drug conviction, Detective Bowermaster was unable to corroborate any of the allegations of concealed criminal activity. While it is of some worth that the two criminal defendants were

able to identify Bracy's place of residence, the lack of specificity as to the alleged criminal activity and Detective Bowermaster's inability to corroborate that more important and non-public information somewhat weakens the persuasiveness of the claims. In essence, Detective Bowermaster could corroborate only public information.

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Florida v. J.L.*, 529 U.S. 266, 272 (2000) (citing 4 W. LaFave, Search and Seizure § 9.4(h) (3d ed.1996)).

While Detective Bowermaster was unable to corroborate the most sensitive information from the tippers, the notion that Bracy had recently been dealing methamphetamine was corroborated by the several tips he received. We find that interpreting the application "in a common sense, rather than a hyper-technical, manner," *Gogg*, 561 N.W.2d at 363–64, the magistrate was entitled to rely on information received from the concerned citizens and criminal defendants, even if we excise the hearsay from the statements, as corroboration of their allegations of concealed criminal conduct in conjunction with the additional information set forth in the application.

### B. Jailhouse Calls

Detective Bowermaster listened in to two jailhouse calls. In the first, Bracy spoke with a person Bowermaster believed to be Bracy's father. In that

conversation, Bracy said, "Don't let nothing happen to my safe man. There is a lot of money in that safe. That's where everything is."

In the second call, Bracy spoke to a female he referred to as Maria. During the call, she said, "do you know how much shit I have gone through to get your debt paid off?" Bracy replied, "It's like I told him, all that shit is right there from my dad's house." Detective Bowermaster asserted that the term "shit" refers to methamphetamine, citing his experience.

The parties dispute whether it can be fairly inferred from Bracy's use of the term "shit" that he was referencing methamphetamine. The State argues such an inference is reasonable in light of Detective Bowermaster's statement that he "know[s] from experience that people often refer to meth as 'shit.'" Bracy contends that he used the term "shit" in a way akin to a synonym for "stuff or things." We need not fully resolve this issue, as we consider the jailhouse calls in the context of the totality of the contents of the warrant application. Given the totality of the circumstances, we think a reasonable person could develop some suspicion from these calls.

### C. Criminal History

Detective Bowermaster asserted in the warrant application that Bracy had the following criminal history: "Possession with intent controlled substance violation conviction on 8/18/14"; "Carrying weapons violation 10/13/15"; and "Possession of a controlled substance (meth) conviction on 1/13/17." "[A]s a general matter, an individual's prior criminal record is a valid consideration" upon

which to issue a search warrant. *McNeal*, 867 N.W.2d at 102. "The judge could consider it as a factor." *Id.*

### D. Training of Officer

Finally, "[w]e have recognized 'police must "draw upon their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."'" *State v. Maddox*, 670 N.W.2d 168, 172–73 (Iowa 2003) (quoting *State v. Heuser*, 661 N.W.2d 157, 161 (Iowa 2003)); *see also State v. Hoskins*, 711 N.W.2d 720, 728 (Iowa 2006) (considering officers' knowledge and experience in assessing whether probable cause existed to support a search). We have also recognized that "[a]n officer's expert opinion is an important factor to be considered by the judge reviewing a warrant application." *Godbersen*, 493 N.W.2d at 856; *accord United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("A number of cases have ruled that an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application.").

In the search warrant application, Detective Bowermaster stated that, based on his training and experience, it is common "[t]hat narcotics traffickers often have cash or other valuables on hand that they use to purchase narcotics with or that represent proceeds of drugs sales. I also know that drug traffickers will place these assets in safe-deposit boxes or other similarly secured locations"; "that it is common for drug dealers and users to keep on their persons, their residences, in their vehicles, or otherwise at or in property owned or possessed by them evidence relevant to an investigation of illegal drug sales and/or distribution"; and that people often refer to meth as "shit." Coupled with his training and experience, it was

probable that Detective Bowermaster would find evidence of illegal activity through the residence the defendant was residing at and the vehicles listed in the warrant.

**V.  Conclusion**

Considering the totality of the information presented in the warrant application, we hold the magistrate had a substantial basis for concluding that probable cause existed.  Here, even if we excise the hearsay information contained in the concerned citizen's information, based on the totality of the circumstances as presented in the search warrant application, probable cause existed to support the search warrant in this case.  Looking at the detailed information presented in the application and considering the common sense inferences a reasonable person may draw from that information, the issuing judge could have reasonably concluded Bracy was dealing narcotics.  The issuing judge could have also reasonably concluded authorities would find evidence of those crimes in his home and vehicles.

While we agree with Bracy that the jailhouse calls could be read as innocuous concern over permissible cash storage in a home locker, his comments could also be interpreted as concern over a valuable cache of contraband.  His prior criminal convictions, one of which was roughly twenty months old at the time the warrant was executed, adds credence to the more skeptical interpretation.  It is clear that the informants in this case likely do not alone meet the standards set out in the cases cited by the parties.  Our decision, however, is not based on any sole tip in Detective Bowermaster's application for warrant; rather, the information collectively, the jailhouse calls, Bracy's prior drug conviction, Bracy's eluding law enforcement shortly before the execution of the warrant, and Detective

Bowermaster's investigation all together provide a substantial basis for the magistrate's issuance of the warrant. Given our finding that a substantial basis existed for the issuance of the warrant, we affirm the district court's denial of Bracy's motion to suppress and conviction.

**AFFIRMED.**