Jereme E. BURDINE, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 55A01–0008–CR–267.

Court of Appeals of Indiana.

June 11, 2001.

Susan K. Carpenter, Public Defender of Indiana, J. Michael Sauer, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Jereme E. Burdine appeals his convictions for Child Molesting,[1] a class A felony, and Neglect of a Dependent,[2] a class D felony. Specifically, Jereme contends that the victim's statements inculpating him did not fall under the excited utterance exception to the hearsay rule, and, therefore, the trial court erred in admitting them into evidence.

---

1. IND.CODE § 35–42–4–3(a)(1).

2. IND.CODE § 35–46–1–4(a)(3).

## FACTS

The facts most favorable to the verdict indicate that three-and-a-half-year-old E.M. fell asleep in her room on the evening of April 20, 1999. When Ruth Burdine, E.M.'s mother, left for work at 5:40 a.m. the next morning, E.M. and her one-year-old brother, M.M., were still asleep in the bedroom. Jereme Burdine, E.M.'s stepfather and M.M.'s biological father, was asleep atop blankets on the living room floor. The four lived in a basement apartment.

Around 10:30 a.m. that same morning friends of Ruth and Jereme, Mike and Sarah Lyle, arrived at the apartment. As the Lyles came in, Jereme "threw" some clothes out of the bathroom and took the clothes to the laundry room. Record at 1039. He told the Lyles that he had bathed the kids. Less than an hour after the Lyles had arrived, Mike and Jereme left the apartment. Sarah remained at the apartment with both E.M. and M.M.

Sarah testified that E.M. was acting "very calm and placid" but was usually "very hyper." R. at 1086. While E.M. and M.M. were eating lunch, E.M. began complaining that she did not want to finish her meal. E.M. then went to use the bathroom and came back to the table, refusing to eat. Sarah went to the bathroom for a washcloth and discovered "blood on the toilet." R. at 1089. She subsequently checked E.M. and noticed blood on E.M.'s pants.

Forty-five minutes after Mike and Jereme had left, they returned with a friend. As the truck pulled into the driveway, Sarah ran up to the truck and said that something was wrong with E.M. Jereme instructed Mike and their friend to stay outside while he checked to see what had happened. He then brought M.M. out to the two men, saying that E.M. "had touched herself again and that she was bleeding and he was gonna clean up." R. at 1044. Jereme wanted the men to stay outside so that they would not be offended by the mess. R. at 1044. They remained outside for about ten minutes before he let them back into the apartment. In the meantime, Sarah bathed E.M. in the kitchen sink, put a sanitary napkin in her underwear, and finished dressing her. After cleaning E.M., Sarah put her and M.M. down for a nap. She then went to pick up Ruth from work.

When Ruth returned to the apartment, she called Michelle Kiefer, a caseworker for the Center for Behavioral Health in Martinsville. Kiefer had been working with the Burdines because they were concerned about E.M.'s "oppositional defiance and aggressive behaviors." R. at 1150. Previously, Ruth had complained to Kiefer that she "would catch [E.M.] . . . 'touching herself' " and that E.M. "was masturbating . . . sometimes two or three times a week." R. at 1150. When Kiefer arrived, she noticed that E.M. was acting differently than she had acted before in Kiefer's presence. The previous time they had met, E.M. was boisterous but now was "extremely quiet" and sucking her thumb. R. at 1165.

Kiefer and Ruth subsequently took E.M. to the hospital where Dr. Cloud, an emergency room physician, examined her. Dr. Cloud testified that E.M. had a vaginal laceration extending from the bottom part of her vagina into her rectum. R. at 1196. That injury was consistent with child molestation. Dr. Cloud further testified that E.M. exhibited the worst injuries related to a child molestation case that he had ever seen. He opined at trial that E.M.'s "calm and sedated" demeanor was consistent with defense mechanisms of victims of emotional trauma. R. at 1196–97.

After his initial examination of E.M., Dr. Cloud left the room to call Child Protective Services. Ruth, upset, also left the room to make a phone call. While alone with E.M., Kiefer tried to comfort her by telling her that her·mom was not mad at E.M. and that she was not in trouble. Kiefer also told E.M. that they were trying to help E.M. because she was hurt; at which point, E.M. interjected: "Daddy did it." R. at 1183. Kiefer did not understand what E.M. said and asked her to repeat herself. E.M. responded, "[M]y daddy did it." R. at 1183.

Roughly twenty minutes afterward, Myrtle Spencer, an investigator for the Office of Family and Children (OFC); a case manager for the OFC; and Officer Jeff Schenck of the Martinsville Police Department arrived at the emergency room. Officer Schenck and the others asked E.M. who had hurt her. She responded, "Daddy Jereme." R. at 1226. Prompted by further questioning about how she was hurt, E.M. stated that "Daddy Jereme" had put a blanket over her face, while she tried to push him away. R. at 1227.

On May 11, 1999, the State filed an amended information, charging Jereme with two counts of child molesting and one count of neglect of a dependent. The first child molesting count charged Jereme with performing "sexual intercourse" with E.M. R. at 50. The second child molesting count charged Jereme with performing "sexual deviate conduct" with E.M. R. at 50. Because Jereme was over the age of twenty-one, both charges are class A felonies.[3]

At trial, over Jereme's hearsay objections; Kiefer, Spencer, and Officer Schenck testified to E.M.'s statements made in the hospital examination room.

Clothes belonging to E.M., stained with blood, were introduced into evidence along with a pair of Jereme's blue jeans with bloodstains along the interior zipper,[4] several washcloths, two white blankets, a couch cushion, stained carpet, and a blue towel. DNA testing positively identified E.M.'s blood on the towel and E.M.'s underwear, nightgown, and pants. DNA testing of these items and swabs from E.M.'s private areas revealed no traces of semen. After the jury trial, Jereme was convicted of the sexual-deviate-conduct charge of child molesting as well as neglect of a dependent. R. at 217–18. He now appeals.

## DISCUSSION AND DECISION

■ Jereme argues that E.M. was no longer under the stress of a startling event when she told Kiefer, "Daddy did it." R. at 1183. He claims that too much time had elapsed between the startling event and E.M.'s statement. Jereme also maintains that E.M.'s quiet demeanor, interaction with other people, and her nap indicate that E.M. was not under the stress of the startling event. All of these circumstances, so Jereme's argument goes, show that the trial court abused its discretion in admitting E.M.'s statement into evidence.

■ Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is inadmissible pursuant to Ind. Evidence Rule 802. However, Ind. Evidence Rule 803 lists twenty-three exceptions where hearsay testimony is admissible. When a trial court admits hearsay testimony pursuant to an exception, we review such admission under an abuse of discretion standard. *Noojin v. State*, 730 N.E.2d 672, 677 (Ind.2000). Because the

---

**3.** I.C. § 35–42–4–3(a)(1).

**4.** The amount of blood on Burdine's jeans was too small of a sample for DNA testing. R. at 1465.

foundational requirements to admissibility often require factual determinations by the trial court, these findings are entitled to the same deference on appeal as any other factual finding. *Stahl v. State*, 686 N.E.2d 89, 91 (Ind.1997). Hearsay is admissible under the excited utterance exception when the statement relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid. R. 803(2). To admit an excited utterance into evidence, the proponent must show: 1) a startling event, 2) a statement made by a declarant while under the stress of the startling event, and 3) the statement relates to the startling event. *Jenkins v. State*, 725 N.E.2d 66, 68 (Ind.2000). The amount of time that has passed between the event and the statement is relevant but not dispositive. *Noojin*, 730 N.E.2d at 676. We must also consider whether the statements were made in response to inquiries. *Hardiman v. State*, 726 N.E.2d 1201, 1204 (Ind.2000). Whether given in response to a question or not, the statement must be unrehearsed and made while still under the stress of the excitement from the startling event. *Id.*

The State presented a number of witnesses whose testimony indicates that E.M. made the out-of-court statement while under the excitement of the startling event. First, Dr. Cloud opined that E.M. was surprisingly "calm and sedated" given that she exhibited the worst molestation injuries he had ever seen in his thirteen years as an emergency room physician. R. at 1196–97. He concluded that, because of the severity of the lacerations to the vaginal area, E.M. was coping with the accompanying emotional trauma by "shut[ting] things out." R. at 1997. Second, E.M.'s attending nurse described her as acting "very still and emotionless," R. at 1220, despite the fact that the nurse inserted an IV into E.M.'s arm and the fact that

E.M.'s perineum—the tissue separating the vagina from the rectum—had been obliterated. R. at 1198, 1221. Third, Kiefer testified that E.M., normally boisterous, was "extremely quiet" and sucking her thumb. R. at 1165. Finally, Sarah testified that at the apartment the normally hyperactive E.M. was "very calm and placid." R. at 1086. Thus, given E.M.'s severe injuries, loss of blood, and uncharacteristically calm demeanor; we cannot say that the trial court abused its discretion in finding that E.M. was still under the stress of the startling event when she made the statement implicating Jereme. *See Gye v. State*, 441 N.E.2d 436, 438 (Ind.1982) (affirming admission of statements made by victim of approximately fifty stab wounds because the victim's "injuries and attendant pain" "continued and controlled her thoughts and actions").

◼ Jereme also challenges, on hearsay grounds, the admission of E.M.'s subsequent statement implicating Jereme, which was made to Kiefer, Officer Schenck, and two OFC employees after her initial statement to Kiefer. He maintains their questioning prompted E.M.'s statement that "Daddy Jereme" hurt her and that he put a blanket over her face while she tried to push him away. This questioning, Jereme argues, gave E.M. time and opportunity for reflection and deliberation.

◼ Jereme relies on *Hardiman v. State*, where our supreme court affirmed the trial court's exclusion of crime-scene witness statements given to an investigating officer. 726 N.E.2d 1201, 1204 (Ind. 2000). The *Hardiman* court, however, explained that the witnesses were waiting in line to give statements to an officer investigating a homicide. *Id.* Furthermore, the two were not directly connected to the homicide except as bystanders. *Id.* Statements in response to inquiries then are not

automatically excluded. Rather, to be admissible, a statement given in response to a question must be unrehearsed and made under the stress of the excitement from the startling event. *Id.; see also Love v. State,* 714 N.E.2d 698, 700 (Ind.Ct.App. 1999) (affirming admission of victim's subsequent statements in response to police officer's questioning soon after her initial statements); *Brown v. State,* 683 N.E.2d 600, 603 (Ind.Ct.App.1997) (affirming admission of victim's subsequent statements upon continued questioning by an investigating officer at the hospital), *trans. denied.*

Given the circumstances of this case, we cannot say the trial court abused its discretion in admitting E.M.'s subsequent statement. Jereme has not shown that the length of time between E.M.'s initial statement and the subsequent statement was too long for the excitement of the startling event to have dissipated. Jereme has also failed to show that the subsequent statement was rehearsed or more generally the result of reflection and deliberation. In reaching our decision, we note that E.M.'s statements were not elicited by questions coaxing her to a predetermined answer or questions suggesting that Jereme was responsible for her injuries. Officer Schenck testified that he was trained not to ask "leading questions" of young victims. R. at 1238. Instead, he asked "open ended" questions to ascertain who had hurt her. R. at 1236–37. Therefore, the trial court's admission of the out-of-court statements was not against the logic and effect of the facts and circumstances.

Judgment affirmed.

BAILEY, and MATHIAS, JJ., concur.