Donna FORLER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 65A01–0509–CR–408.

Court of Appeals of Indiana.

April 24, 2006.

Donald E. Baier, Baier & Baier, Mount Vernon, for Appellant.

Steve Carter, Attorney General of Indiana, Gary Damon Secrest, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Donna Forler appeals her conviction for possession of two or more methamphetamine chemical reagents or precursors with intent to manufacture, a Class D felony. We affirm.

### Issue

The issue before us is whether the trial court properly allowed the State to introduce product labels from containers possessed by Forler to prove that she possessed methamphetamine precursors.

### Facts

In the early morning hours of August 1, 2003, Posey County Sheriff's Deputy Thomas Latham pulled over the vehicle Forler was driving for not having an illuminated license plate. Earlier, Latham had observed the vehicle being driven suspiciously in the vicinity of a co-op where tanks of anhydrous ammonia are stored. Deputy Latham obtained Forler's consent to search her vehicle. In the trunk, Deputy Latham and another officer found, among other things, coffee filters, a water bottle with rock salt in it, duct tape, and a medicine bottle with a powdery substance in it. The substance later was tested and found to be ephedrine or pseudoephedrine and tripolodene. Also found was a can of starting fluid with a label indicating that it contained ether, and a Liquid Fire bottle that had been opened and was half-full and had a label indicating that it contained sulfuric acid. The labels indicated that the ether and sulfuric acid were hazardous substances.

The State charged Forler with possessing two or more methamphetamine chemical reagents or precursors with intent to manufacture. The information specifically alleged that Forler had possessed ephedrine or pseudoephedrine, ether, and sulfuric acid. At a bench trial, Forler objected on hearsay grounds to the State's introducing pictures of the labels from the starting fluid can and the Liquid Fire bottle to establish that she had possessed ether and sulfuric acid. The State introduced no other evidence to establish the contents of the starting fluid can or Liquid Fire bottle. After careful consideration, the trial court overruled Forler's objections to both exhibits. The court found Forler guilty as charged. She now appeals.

### Analysis

■ Forler argues that the labels on the starting fluid can and Liquid Fire bottle were inadmissible hearsay. Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is inadmissible pursuant to Indiana Evidence Rule 802. *See Burdine v. State*, 751 N.E.2d 260, 263 (Ind.Ct.App.2001), *trans. denied.* On appeal, the State concedes that the labels constituted hearsay, inasmuch as they were admitted to prove the truth of the matter asserted, i.e. that the starting fluid can and Liquid Fire bottle contained ether and sulfuric acid, respectively.

■ However, there are a number of hearsay exceptions listed in Indiana Evidence Rule 803. "When a trial court admits hearsay testimony pursuant to an exception, we review such admission under an abuse of discretion standard." *Id.* "Because the foundational requirements to admissibility often require factual determinations by the trial court, these findings are entitled to the same deference on appeal

as any other factual finding." *Id.* at 263–64. An abuse of discretion occurs if a decision is clearly against the logic and effect of the facts and circumstances before the court. *Kelley v. State,* 825 N.E.2d 420, 424 (Ind.Ct.App.2005). "[T]o the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result." *Pruitt v. State,* 834 N.E.2d 90, 104 (Ind.2005).

The State contends that the labels on the starting fluid can and Liquid Fire bottle were admissible pursuant to Indiana Evidence Rule 803(17), "Market Reports, Commercial Publications," which exempts from the hearsay rule, "Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." There is scant case law, in this and other jurisdictions, addressing this particular hearsay exception. However, our supreme court did recently analyze it in *Reemer v. State,* 835 N.E.2d 1005 (Ind.2005), another case concerning methamphetamine precursors.

In *Reemer,* the State sought to prove that the defendant possessed pseudoephedrine by introducing labels on nasal decongestant boxes listing that chemical (or its isomer) as an ingredient, in combination with undisputed evidence that the defendant possessed pills in unopened blister packs that were originally contained in the boxes. The court first noted that Indiana does not have a "residual" hearsay exception; thus, it could not rely directly upon cases decided in other jurisdictions that had held that commercial drug labels were admissible under a "residual" hearsay exception. *See id.* at 1008. However, it did rely upon two cases from other jurisdictions that had held labels on commercially marketed drugs to be admissible under "market reports" exceptions to the

hearsay rule. *See id.* (citing *Burchfield v. State,* 892 So.2d 191, 199 (Miss.2004); *State v. Heuser,* 661 N.W.2d 157, 165 (Iowa 2003)). Noting strict federal and state regulations governing the accuracy of commercially marketed drug labels, our supreme court held "that labels of commercially marketed drugs are properly admitted into evidence under the exception provided by Evidence Rule 803(17) to prove the composition of the drug." *Id.* at 1009. Further, the court observed that there was no dispute that the blister packs in the defendant's possession had once been in the boxes, which were found elsewhere, and concluded, "The fact that the tablets were in the original unbroken blister packs is sufficient to establish that the contents remained as the manufacturer packaged them." *Id.*

Forler first contends that as a general matter, labels on items such as starting fluid and Liquid Fire do not fall within *Reemer's* holding. It is true, as Forler argues, that *Reemer* was concerned specifically with commercially marketed pharmaceuticals and that it relied upon particular federal and state statutes regulating pharmaceutical labeling before ultimately concluding, "physicians, patients and the general public routinely rely on regulated manufacturing practices and mandatory labeling to assure that pharmaceuticals are as they are represented to be." *Id.* However, we see no indication that our supreme court intended to foreclose any consideration of other types of product labels as possibly falling under Evidence Rule 803(17)'s hearsay exception for "market reports" and "commercial publications."

Instead, we discern the opposite. In two footnotes, the court cited with apparent approval a number of cases that had found various types of compilations or published materials other than drug labels to be admissible hearsay "where they are

generally relied upon either by the public or by people in a particular occupation." *Id.* at 1008 and 1008 n. 6; *see also id.* at 1009 n. 7. Of particular interest in this case is our supreme court's citation to *Ledford v. State*, 239 Ga.App. 237, 520 S.E.2d 225, 229 (1999), for the proposition that the "public can rely on labels to show a product includes a hazardous substance because 'a manufacturer would have no interest in proclaiming that the product contained such a substance if in fact it did not.'" *Id.* at 1009 n. 7.

We feel compelled to note that our supreme court's pinpoint citation to and quotation from *Ledford* actually is from a dissenting opinion filed in that case, in which the majority had held that a spray paint can's label, identifying the intoxicant toluene as one of the ingredients, was inadmissible hearsay. *Ledford*, 520 S.E.2d at 228–29. We assume, however, that our supreme court intended to indicate its agreement with the dissenting opinion.[1] Additionally, the passage from the *Ledford* dissent that our supreme court quoted actually comes from a California case, *In re Michael G.*, 19 Cal.App.4th 1674, 24 Cal. Rptr.2d 260 (1993).

California has a hearsay exception that closely parallels Indiana Evidence Rule 803(17), which provides: "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business ...." Cal. Evid.Code § 1340. In *Michael G.*, the court considered whether a label from a paint can, listing toluene as ingredient, was admissible under this hearsay exception. The court concluded:

While we agree with appellant that a manufacturer might have devious reasons for failing to advise the public of the dangers of its product, the converse is not true. A label *including* (rather than excluding) a hazardous substance is inherently trustworthy, in that a manufacturer would have no interest in proclaiming that the product contained such a substance if in fact it did not. However, our holding is limited strictly to the *presence* of a hazardous substance, and not to its quantity or quality. The trial court was thus entitled to take judicial notice that the public relies on the dangers and antidotes listed on a label as a matter of common knowledge, and to conclude that the label was generally used and relied on as accurate in the course of a business within the meaning of the compilation exception to the hearsay rule of Evidence Code section 1340.

*Michael G.*, 24 Cal.Rptr.2d at 262 (footnote omitted) (emphases in original).

In addition to *Michael G.*, we note that in the *Heuser* opinion relied upon by our supreme court in *Reemer*, the Iowa Supreme Court held not only that cold medicine labels were admissible into evidence, but also that battery labels indicating that the batteries contained lithium were admissible under the "market reports" hearsay exception. *Heuser*, 661 N.W.2d at 165. The court acknowledged that the batteries were not governed by strict labeling requirements, as was the cold medicine, but concluded nonetheless, "There is nothing in the record to suggest the battery labels indicating they contained lithium were untrustworthy or had been altered from their original form." *Id.*

Here, the starting fluid can's label stated in part, "PRECAUTIONS—DANGER: Contains n-heptane ..., diethyl ether ...,

---

1. Georgia apparently does not have a hearsay exception for "compilations" that would par-

allel Indiana Evidence Rule 803(17). *See Ledford*, 520 S.E.2d at 228.

carbon dioxide ..., lubricant oil .... Use in well ventilated area. EXTREMELY FLAMMABLE." Ex. 4. The Liquid Fire bottle's label stated in part, "CAUTIONS—READ BEFORE USING—Contains concentrated sulfuric acid. May cause eruption of hot acid when poured into drain. Protect eyes, face and other portions of body." Ex. 24. We readily conclude, as did the *Michael G.* court, that manufacturers would have little to no incentive to place such warnings of hazardous contents on their products if such were not true. On the contrary, the only persons who might actually be directly motivated to buy starting fluid or Liquid Fire *because* they have dangerous ingredients, or who might feel "cheated" if they in fact did *not* contain ether and sulfuric acid, would be methamphetamine manufacturers. We believe it is permissible to assume that where a product label warns consumers that it contains dangerous ingredients, the general public reasonably relies upon the accuracy of such warnings.

We must now continue our analysis. The *Reemer* opinion seems to place a second foundational requirement for the admissibility of a product label as evidence that the defendant possessed an ingredient listed on the label, and that is that there be some evidence that the contents of the product remained as the manufacturer packaged them. *See Reemer,* 835 N.E.2d at 1009. Stated another way, there must be some evidence that at the time the police seized a container, the contents of the package or container where the label is placed are the original contents. This makes sense, because it is conceivable that the contents could be altered or replaced after opening of the package or container. *See also Morris v. State,* 604 N.E.2d 665, 668 (Ind.Ct.App.1992) (holding that "infor-

mation communicated by a manufacturer's original labelling [sic], coupled with evidence that the packaging remains intact, is admissible to prove the nature of the contents of the package.").[2]

In this case, it does appear that neither the starting fluid can nor the Liquid Fire bottle were new and unused when they were seized by the police. With respect to the starting fluid can, it is apparent from the photograph of the can that it was a standard aerosol-type can resembling a spray paint or hairspray can. It had a small nozzle at the top, which would dispense the contents of the can when pressed. Officer Terry Cooper of the Mt. Vernon Police Department testified that when he originally seized the can, "It had contents in it." Tr. p. 99. He also testified that the nozzle was still intact, and there was no indication that the can had been punctured or tampered with in any way. Common sense, knowledge, and experience teaches that consumers cannot readily open nor can they readily replace the contents of aerosol-type cans, like the starting fluid can in this case, unless they have been punctured or tampered with in some way. We conclude there is a sufficient foundational basis for concluding that the starting fluid can still contained original contents as packaged by the manufacturer at the time it was seized by law enforcement. Thus, we hold that the label indicating ether, a hazardous substance, as one of the contents of the starting fluid can was admissible into evidence under Indiana Evidence Rule 803(17) as proof that Forler possessed ether.

■ The Liquid Fire bottle presents a more difficult issue. This bottle had a screw-off cap, and Officer Cooper testified that the bottle was only half-full when he

---

**2.** *Morris* was decided before the adoption of the Indiana Rules of Evidence, and it does not directly discuss the common law hearsay rule or any of the common law exceptions.

seized it. Unlike the starting fluid can, the original contents of the Liquid Fire bottle easily could have been replaced with another substance. Officer Cooper, who has received special training from the FBI regarding methamphetamine manufacturing, did testify that based on his training and experience, the contents of the Liquid Fire bottle appeared to be Liquid Fire, and he conducted a field litmus test of the substance that indicated it had a strong acidic content.

■ We need not reach a final determination of whether Officer Cooper's testimony regarding the contents of the Liquid Fire bottle at the time of its seizure was sufficient to establish a foundation for admission of the Liquid Fire label into evidence as proof that Forler possessed sulfuric acid. Even if it was erroneous to admit the Liquid Fire label, "we will not reverse a conviction if the error is harmless." *Jacobs v. State,* 802 N.E.2d 995, 998 (Ind.Ct. App.2004). "We disregard errors in the admission or exclusion of evidence as harmless unless the errors affect the substantial rights of the party." *Camm v. State,* 812 N.E.2d 1127, 1137 (Ind.Ct.App. 2004), *trans. denied.*

Forler was convicted under Indiana Code Section 35–48–4–14.5(e), which prohibits possession of *two or more* methamphetamine chemical reagents or precursors with intent to manufacture. Here, Forler does not challenge the evidence that she possessed pseudoephedrine or ephedrine, and we have concluded that the starting fluid can label constituted valid proof that she also possessed ether. There was substantial evidence, even when excluding any evidence regarding the Liquid Fire bottle, that she possessed pseudoephedrine or ephedrine and ether with intent to manufacture methamphetamine, given that the pseudoephedrine or ephedrine was in powder form and the presence of several indi-

cia of methamphetamine manufacturing in the trunk of Forler's car. Even if we were to assume without deciding that the Liquid Fire label was erroneously admitted, such did not affect her substantial rights because there still is overwhelming evidence that she possessed two methamphetamine precursors or chemical reagents with intent to manufacture. We are confident the trial court would have found Forler guilty on the basis of this evidence.

### Conclusion

We conclude that the trial court properly admitted the starting fluid can label into evidence as proof that Forler possessed ether, pursuant to Indiana Evidence Rule 803(17). This evidence, combined with her unchallenged possession of pseudoephedrine or ephedrine and other indicia of methamphetamine manufacturing, is sufficient to support her conviction under Indiana Code Section 35–48–4–14.5(e). We affirm.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.