**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| NOAH SHANE WARREN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 63A01-1204-CR-165 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PIKE CIRCUIT COURT
The Honorable Jeffrey L. Biesterweld, Judge
Cause No. 63C01-1010-FB-617

**January 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Noah Shane Warren appeals his convictions for Class B felony dealing in methamphetamine, Class D felony maintaining a common nuisance, and Class D felony neglect of a dependent, as well as his habitual-offender enhancement. He contends that the trial court abused its discretion in admitting into evidence a cold pack that listed ammonium nitrate as an ingredient on its label and in allowing the State to play an audio recording of a 911 call at trial. He also contends that there is insufficient evidence to sustain his convictions. We hold that the trial court did not err in the admission of evidence because the cold-pack label was not improper hearsay evidence and a proper foundation was laid for the 911 call. We also find that there is sufficient evidence to sustain Warren's dealing in methamphetamine and neglect of a dependent convictions and his habitual-offender enhancement, but not his maintaining a common nuisance conviction. We affirm in part and reverse in part.

**Facts and Procedural History**

On October 16, 2010, Warren's two daughters, ten-year-old K.W. and fourteen-year-old C.W., were staying at his home in Pike County. That day, two of Warren's friends, Marty and Audrey, arrived at Warren's house in their red Chevy Blazer. Marty and Audrey went into Warren's bedroom with him and closed the door. Later, Marty, Audrey, Warren, and Warren's two daughters left the house in the red Blazer. They first went to the home of Jerry, one of Warren and Marty's friends. Only Warren and Marty went inside; when they came back outside, they were carrying a bag. They next went to Oakland City where they dropped Marty off at a hardware store while everyone else went

2

to an automotive supply store. When Marty returned to the car from the hardware store, he was carrying a brown bag. The last stop made was at the home of someone named Clint. Only Marty went inside. After leaving Clint's house, they all went back to Warren's house.

When they arrived at Warren's house, Marty took all the items that they had obtained into the bathroom and Warren began heating a clear liquid in a container in the kitchen. C.W. was in the kitchen, and K.W. was going back and forth between the living room and kitchen, which were connected. C.W. heard Marty tell Warren, "don't do that. It might blow up." Tr. p. 398. Warren responded, "I've done this before." *Id.* at 408. After hearing this, C.W. decided to leave the house, fearing that "something bad [was] going to happen." *Id.* at 398. She went to the house of her grandparents, Terry and Phyllis Warren, who lived on the same property but across a field from Warren. C.W. tried to convince K.W. to come with her, but K.W. did not want to leave. As C.W. left, Warren told her that she better not tell her grandparents that Marty and Audrey were at the house; Terry and Marty "didn't really get along." *Id.* at 437.

When C.W. got to her grandparents' house, Phyllis asked if anyone was at Warren's house. C.W. lied and said no. Terry then asked her the same question and C.W. lied again. Meanwhile, Terry's nephew, Daniel Warren, had been setting up a tree stand in the woods with his cousin, Ben Harris. Jamie Warren, who also lived on the property with his father, Jerry, went to Daniel and told him that Terry needed help. Daniel went to the house to help, thinking that Terry was hurt. Instead, Jerry told Daniel

3

that Terry wanted help "trying to run some people off [Warren's property] that [Terry] didn't want up there." *Id.* at 289.

Daniel drove his truck over to Warren's house and noticed a strong chemical odor that smelled like ether. He was concerned that methamphetamine was being made and that the house might blow up. He was also concerned that his nieces might be in danger as a result of the chemicals. Ben also arrived at Warren's house, and Daniel told Ben to back Daniel's truck away from the house in case it blew up. Daniel then went up to the house and knocked on the door but no one answered. As Daniel started to walk away from the house, he saw Terry walking toward the house. Terry told Daniel he did not think anyone was home and that he thought he had run them off. Daniel noted that the red Blazer was still there.

Daniel called Warren and found out that K.W. was still inside the house. Daniel told Warren to let her out, but Warren responded that "there was nothing going on and [Daniel] was effing crazy." *Id.* at 296. K.W. heard Daniel yelling for her from outside, but since she had not seen him for a long time, she did not recognize him and did not leave the house.

Daniel walked closer to the house and pretended like he was calling the police, but he did not call immediately because he did not want to get Warren in trouble. From inside the house, Warren told Daniel, "if I go to jail, I'm going to kick your ass." *Id.* at 297. Warren then came out of the house and got in Daniel's face. The two started fighting and Daniel hit Warren several times.

4

Meanwhile, Terry and Phyllis arrived at Warren's house. When Warren went back inside, Phyllis followed him in and they began to argue, too. Phyllis tried to get into the bathroom where Marty and Audrey were. Marty and Audrey "said they were having sex in there," *id.* at 301, but Phyllis could hear the toilet flushing "quite a few times." *Id.* Phyllis went back outside, and Warren followed, carrying a butcher block of knives. Warren began to throw the knives at Daniel, telling Daniel to get away from his house. Ben then told Daniel if Daniel was not going to call the police, he would. Daniel called the police and his 911 call was recorded. He told the dispatcher that he was trying to "get the kid out of the house." *Id.* at 308. He said that a Chevy Blazer had just left the house, and then went on to say, "I just don't want that little girl to get hurt. The house could blow up." *Id.* at 311. Daniel then handed the phone to Phyllis, who had the following conversation with the dispatcher:

> Dispatcher: Has he made any threats?
> Phyllis: Excuse me?
> D: Has he threatened?
> P: He has just, he has just yelled a lot.
> D: Okay. He hasn't, he hasn't made, he hasn't made any threats on his own life or his daughter's life?
> P: No. No. No. Not, not so ever.

*Id.* at 313. While Daniel and Phyllis were on the 911 call, Marty and Audrey left Warren's house carrying a bag of items.

About the same time, Terry also called the police. He told the dispatcher, "I want to report a radical driver. I think they're on dope and stuff. And they're driving crazy." *Id.* at 315. He also told the dispatcher that the red Blazer "just went down Oatsville Road toward 57." *Id.* Warren then started removing items from the house, throwing some into

5

the tree line next to the house. He also brought out a trash bag full of items, dumped them into the burn pile, and tried to light them on fire, but they would not light. Police officers also began to arrive, and as all of the officers approached the house, they smelled the strong smell of ether, which appeared to be coming from inside the house. *Id.* at 510, 591, 646.

Pike County Sheriff's Department Deputy Brad Jenkins was the lead investigator at the scene. Conservation Officer Duane Englert walked around the house and saw K.W. inside. Officer Englert went to the door and Warren met him there. Officer Englert told Warren that he needed to come outside so that they could talk. When Warren came outside, Officer Englert handcuffed him and escorted him away from the house. Officer Englert stayed with Warren while the other officers on the scene cleared the house, obtained a search warrant, and searched the house and the tree line. Warren told Officer Englert that he had been cleaning up and getting rid of some things in the house and had taken a shoe box to the tree line to get rid of it. *Id.* at 518. Warren said that one of the items inside the shoe box was a bloody sock because he had cut himself while he was cleaning up. *Id.* Warren also said that he had started cleaning up when he found out that the police were coming to his house. *Id.* at 521-22. During the conversation, Officer Englert noticed that Warren was "somewhat over excited," so he asked Warren about his methamphetamine use. *Id.* at 544-45. Warren said that he had used methamphetamine two days ago, but he had purchased it and not made it himself. Officer Jenkins asked Officer Englert to conduct a taped interview with Warren. Officer Englert advised Warren of his *Miranda* rights and asked him to give a taped statement. Warren then

6

began recanting his story and gave a different statement than he had a few minutes before when he was speaking to Officer Englert and not being taped. *Id.* at 522. Officer Englert stopped the recording.

Meanwhile, the other officers who had obtained a search warrant were searching Warren's home. They found lithium batteries, two pairs of scissors, an empty prescription bottle that had previously held 90 pills and was prescribed only four days earlier, a manipulated light bulb and foil that could be used to smoke methamphetamine, and a plate with a white residue on it. *Id.* at 570, 619-24, 631, 678-81.

Officer Englert searched outside and found the burn pile and a white trash bag that was partially open. Inside the trash bag were burned aerosol cans. *Id.* at 532. In the burn pile were the outer cases of batteries. *Id.* at 665. Terry and Daniel directed officers to the tree line where Warren had thrown some items, and officers found the box containing Warren's bloody sock, along with a cold pack, a plastic ketchup bottle with white residue inside, and burnt cans with holes in the bottom. *Id.* at 369, 650.

William Bowles, a forensic scientist, examined some of the items that were found at Warren's house. The white residue inside the ketchup bottle was not methamphetamine, ephedrine, or pseudoephedrine. *Id.* at 569-70. The plate with white residue on it was washed with chloroform, and Bowles determined that it contained either ephedrine or pseudoephedrine, precursors for manufacturing methamphetamine. *Id.* at 570-71. At trial, Bowles testified that simply putting pills that contained ephedrine or pseudoephedrine on the plate would most likely not leave that type of residue, but it was

7

not impossible; it was much more likely for the residue to be left if the pills were crushed up. *Id.* at 581.

The State charged Warren with Class B felony dealing in methamphetamine, Class D felony maintaining a common nuisance, Class D felony possession of two or more precursors, Class D felony neglect of a dependent, Class D felony possession of methamphetamine, and Class A misdemeanor possession of paraphernalia. The State later moved to amend the charging information and add a habitual substance offender enhancement. The trial court granted the motion. The State then moved to dismiss the Class D felony possession of methamphetamine charge.

A jury trial was held in February 2012. At trial, the trial court admitted a cold pack that listed ammonium nitrate as an ingredient on its labeling information into evidence over Warren's hearsay objection. The trial court also admitted the audio recording of Terry's 911 call into evidence over Warren's objection, finding that the State had laid a proper foundation. The jury found Warren guilty on all counts, and Warren pled guilty to the habitual-offender enhancement. At the sentencing hearing, the trial court imposed a sentence of twelve years for dealing in methamphetamine, two years for maintaining a common nuisance, two years for possession of two or more precursors, one year for possession of paraphernalia, and two years for neglect of a dependent, all to be served concurrently. This twelve-year sentence was enhanced by four years based upon the habitual-offender enhancement, for an aggregate sentence of sixteen years.

Warren now appeals.

**Discussion and Decision**

8

Warren raises six arguments on appeal: (1) whether the trial court erred in admitting into evidence the cold-pack label that said it contained ammonium nitrate; (2) whether the trial court abused its discretion in allowing the State to introduce Terry's 911 call; (3) whether there is sufficient evidence to sustain his dealing in methamphetamine conviction; (4) whether there is sufficient evidence to sustain his maintaining a common nuisance conviction; (5) whether there is sufficient evidence to sustain his neglect of a dependent conviction; and (6) whether there is sufficient evidence to sustain his habitual-offender enhancement.

## I. Hearsay Evidence

Warren contends that the trial court abused its discretion in admitting into evidence a cold pack that listed ammonium nitrate as an ingredient on its label. A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Kimbrough v. State*, 911 N.E.2d 621, 631 (Ind. Ct. App. 2009). The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* Error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected. Ind. Evidence Rule 103.

Warren argues that the label was inadmissible hearsay. The State concedes that the cold-pack label is hearsay, "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). We agree that the label is hearsay but disagree with Warren

9

that it is inadmissible. Hearsay is not admissible at trial unless it fits into one of a number of exceptions, one of which is "Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." Ind. Evidence Rule 803(17).

This hearsay exception was addressed in the context of drug labels for the first time in *Reemer v. State*, 835 N.E.2d 1005 (Ind. 2005), which set forth two foundational requirements for a drug label's admissibility into evidence. For the first requirement, our Supreme Court held that "labels of commercially marketed drugs are properly admitted into evidence under the exception provided by Evidence Rule 803(17) to prove the composition of the drug." *Id.* at 1009. The court in *Reemer* also found "various types of compilations or published materials other than drug labels to be admissible hearsay 'where they are generally relied upon either by the public or by people in a particular occupation.'" *Forler v. State*, 846 N.E.2d 266, 268-69 (Ind. Ct. App. 2006) (citing *Reemer*, 835 N.E.2d at 1008). The second requirement is that "there must be some evidence that at the time the police seized a container, the contents of the package or container where the label is placed are the original contents." *Id.* at 270. However, in *Robertson v. State*, this Court did not decide the issue of the second *Reemer* foundational requirement, but it did suggest that it may not be applicable in a case where a defendant is charged with manufacturing methamphetamine:

> Indeed, the second foundational requirement does make sense when the State seeks to admit an exhibit intended to prove that a defendant *possessed* a precursor indicated on a label. However, for a dealing in methamphetamine by manufacturing charge, where the State is required to prove that a defendant manufactured methamphetamine or was in the process of manufacturing methamphetamine, it does not seem to make

sense because the State is trying to prove that the defendant already used the precursors or other items associated with the manufacturing process.

*Robertson*, 877 N.E.2d 507, 514 n.3 (Ind. Ct. App. 2007), *reh'g denied*.

In this case, Warren contends that the cold pack meets neither of the *Reemer* foundational requirements because the State failed to establish that the public would reasonably rely upon the cold-pack label and because the cold pack was open when it was found. Appellant's Br. p. 34. We disagree.

We find that the cold pack satisfies the first *Reemer* requirement. In *Reemer*, our Supreme Court relied on an Iowa Supreme Court case that dealt with the label on a pack of lithium batteries. *State v. Heuser*, 661 N.W.2d 157, 165 (Iowa 2003). The court "acknowledged that the batteries were not governed by strict labeling requirements, as was the cold medicine, but concluded nonetheless, 'There is nothing in the record to suggest the battery labels indicating they contained lithium were untrustworthy or had been altered from their original form.'" *Forler*, 846 N.E.2d at 269 (quoting *Heuser*, 661 N.W.2d at 165). The same is true in this case; while the cold-pack label is not governed by the same strict requirements as drug labels, there is nothing in the record that shows that it is either false or has been altered. The general public can therefore rely upon the label, satisfying the first *Reemer* requirement.

As for the second *Reemer* requirement, we agree with this Court's decision in *Robertson* that it does not logically apply to a dealing in methamphetamine by manufacturing charge. *Robertson*, 877 N.E.2d at 514 n.3. Requiring a precursor to be unaltered when the defendant is accused of using that precursor to manufacture methamphetamine is counterintuitive. While this requirement may be logical for a

11

possession of methamphetamine charge, the same cannot be said in a case like this when the charge is for manufacturing.

However, even if the decision to admit the cold-pack label was an abuse of discretion, we will not reverse the trial court if the ruling constituted harmless error. *Decker v. Zengler*, 883 N.E.2d 839, 845 (Ind. Ct. App. 2008), *reh'g denied*, *trans. denied*. We have held that "any error in admission of evidence is harmless if the same or similar evidence has been admitted without objection." *Edwards v. State*, 730 N.E.2d 1286, 1289 (Ind. Ct. App. 2000). In this case, Deputy Jenkins twice testified that the cold pack contained ammonium nitrate that, when mixed with other items, would make anhydrous gas. Tr. p. 487-88, 655. Defense counsel did not object to this testimony. Since there was no objection, evidence that the cold pack contained ammonium nitrate was before the jury, so any error in admitting the cold pack's label would be harmless.

## II. Authentication of the 911 Call

Warren also contends that the trial court erred in allowing the State to play the audio recording of Terry's 911 call. Again, a trial court has broad discretion in ruling on the admission or exclusion of evidence. *Kimbrough*, 911 N.E.2d at 631. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* Error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected. Evid. R. 103.

12

Indiana Evidence Rule 901(a) governs authentication of evidence and provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Warren argues that the State did not present sufficient evidence to authenticate the 911 call before playing it. We disagree.

At trial, Daniel testified that he was present when Terry made the 911 call. Tr. p. 303-05. He also testified that he had listened to the recording before trial, verified its accuracy, and put his initials and date on the CD after he listened to it. *Id.* at 302-03. We find this to be sufficient authentication of the 911 call to admit it into evidence. Warren, however, argues that Daniel's statement during his testimony that "I don't know if Terry's on there," *id.* at 304, is sufficient to undermine his authentication of the call. But we must consider conflicting evidence "most favorably to the trial court's ruling." *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). After making that statement, Daniel went on to identify Terry's voice on the 911 call, so we find no error in the trial court's admission into evidence of the 911 call.

Warren also contends that this is an example of evidence admitted under the "silent witness" theory and therefore requires a heightened standard of authentication. The "silent witness" theory allows "videotapes and photographic evidence [to] be admitted as substantive evidence, rather than merely as demonstrative evidence." *Edwards v. State*, 762 N.E.2d 128, 136 (Ind. Ct. App. 2002). When this is the case, a higher standard of authenticity must be met because "there is no one who can testify as to its accuracy and authenticity [and] the photograph must 'speak for itself' . . . because

13

such a 'silent witness' cannot be cross-examined." *Id.* But this is not the case here. Daniel and Terry both testified at trial and were available for cross-examination. Daniel also testified to provide authentication for the 911 call, so the call was not admitted under the "silent witness" theory.

We therefore hold that the 911 call was properly authenticated and the trial court did not abuse its discretion in admitting it into evidence.

### III. Sufficiency of the Evidence

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. We consider only the evidence most favorable to the judgment and the reasonable inferences draw therefrom and affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id.* Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Id.*

### A. Dealing in Methamphetamine

Indiana Code section 35-48-4-1.1(a) governs dealing in methamphetamine and provides:

(a) A person who:
    (1) knowingly or intentionally:
        (A) manufactures;
        (B) finances the manufacture of;
        (C) delivers; or
        (D) finances the delivery of;
    methamphetamine, pure or adulterated; . . .
commits dealing in methamphetamine, a Class B felony . . . .

14

Additionally, Indiana Code section 35-48-1-18 defines "manufacture" in relevant part as:

(1) the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes packaging or repackaging of the substance or labeling or relabeling of its container.

In *Bush v. State*, 772 N.E.2d 1020, 1023 (Ind. Ct. App. 2002), *trans. denied*, this Court held that "[t]he statute does not state that the process must be completed or that there must actually be a final product before it applies." All that is needed is sufficient circumstantial evidence of methamphetamine production so that "a reasonable juror in this case could certainly conclude that [the defendant] manufactured methamphetamine." *Id.* Additionally, in *Dawson v. State*, 786 N.E.2d 742, 748 (Ind. Ct. App. 2003), *trans. denied*, this court held that "once an individual crushes up pills in order to separate the ephedrine from the pill binders, the manufacturing process has begun," as the defendant has begun extracting the ephedrine from the pill.

Warren contends that the State has failed to provide sufficient evidence to show that he had begun the manufacturing process. We disagree. At trial, the State presented evidence that police officers found metal battery casings, lithium batteries, and scissors commonly used to strip lithium from batteries at Warren's house. Tr. p. 622-23, 665. They also found a cold pack – which contains ammonium nitrate – that had been cut open and placed in the bloody sock that Warren had thrown into the tree line, along with a plate containing a residue that was either ephedrine or pseudoephedrine. *Id.* at 570-71, 650, 681. Deputy Jenkins testified that battery casings are frequently found at

15

methamphetamine labs and that there is no reason for metal casings from alkaline batteries to be removed. *Id.* at 669-73, 701. Deputy Jenkins also testified about how ammonium nitrate is removed from cold packs and mixed with lye to produce anhydrous gas, a necessary element to manufacture methamphetamine. *Id.* at 485-88, 490-91. He also noted that he could not think of any other reason why someone would cut open a cold pack other than to manufacture methamphetamine. *Id.* at 655. Further, the forensic scientist testified that the ephedrine powder that was found on the plate most likely came from pills being crushed, *id.* at 581, which Deputy Jenkins explained was a common method used by methamphetamine manufacturers to extract the necessary ephedrine. *Id.* at 470. Finally, the State presented the exchange between Marty and Warren when Marty told Warren "don't do that. It might blow up," *id.* at 398, and Warren replied, "I've done this before." *Id.* at 408.

Based on this circumstantial evidence, a reasonable juror could find that methamphetamine was being manufactured at Warren's house. Although Warren argues that he could not have manufactured methamphetamine with the ingredients found at his house, our holding in *Bush* clearly states that the final product or final process need not be found in order for the statute to apply. Our holding in *Dawson* also applies, as a reasonable juror could find that Warren had crushed pills to extract ephedrine, which is sufficient to trigger the manufacturing process. We therefore hold that there was sufficient circumstantial evidence to sustain Warren's manufacturing methamphetamine conviction.

*B. Maintaining a Common Nuisance*

16

Warren also contends that there is insufficient evidence to sustain his maintaining a common nuisance conviction. Indiana Code section 35-48-4-13(b)(2)(B) governs this offense, stating in relevant part:

> (b) A person who knowingly or intentionally maintains a building, structure, vehicle, or other place that is used one (1) or more times: . . .
> (2) for unlawfully: . . .
> (B) keeping; . . .
> controlled substances, or items of drug paraphernalia as described in IC 35-48-4-8.5; commits maintaining a common nuisance, a Class D felony.

Warren argues that there was no evidence that he used his residence to keep methamphetamine so his conviction must be reversed. We agree.

In the charging information, the State alleged that Warren used his house to keep methamphetamine. Appellant's App. p. 33. Since there was no evidence of any methamphetamine found in the house or on his person, there is insufficient evidence to sustain Warren's conviction as charged. While there were items of drug paraphernalia in his house, the State did not charge Warren as such, so his conviction must be reversed.

*C. Neglect of a Dependent*

Warren was convicted of Class D felony neglect of a dependent. Indiana Code section 35-46-1-4(a)(1) governs neglect of a dependent and states in relevant part:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
> (1) places the dependent in a situation that endangers that dependent's life or health;
> commits neglect of a dependent, a Class D felony.

The charging information states that Warren "attempted to manufacture methamphetamine within the kitchen of his residence and within the reach of a ten year old, K.W. (A Minor) . . . ." *Id.* at 152. Warren contends that the State failed to show that

17

he took a substantial step toward manufacturing methamphetamine in his kitchen, so there is insufficient evidence for his neglect of a dependent conviction to stand. We disagree.

Indiana Code section 35-41-5-1 defines attempt and states that "[a] person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime." The evidence adduced at trial shows that Warren did make a substantial step toward manufacturing methamphetamine. Multiple precursors were found in his house, as discussed above, and traces of ephedrine were found on a plate, presumably from crushing cold pills to extract the ephedrine. Tr. p. 581. It was therefore reasonable for the jury to find that Warren had taken a substantial step toward the manufacturing of methamphetamine. This is sufficient evidence to sustain his conviction.

### D. Habitual Offender

Warren finally argues that there is insufficient evidence to sustain his habitual-offender enhancement. In order to be determined a habitual offender, the State must establish that the defendant has committed a substance offense after having previously committed two prior unrelated substance offenses. Ind. Code § 35-50-2-10(b). At trial, the State presented evidence that Warren was convicted of operating a vehicle with an ACE of .15 or more on or about June 28, 2004, and convicted of operating a vehicle while intoxicated on or about December 1, 2008. State's Ex. 43-47. Warren also admitted to these convictions. Tr. p. 1486-87. Therefore, Warren's contention is that the State has failed to provide sufficient evidence that he was convicted of a third substance

18

offense in the present case, making him ineligible for a habitual-offender enhancement. We disagree.

A "substance offense" is defined as "a Class A misdemeanor or a felony in which the possession, use, abuse, delivery, transportation, or *manufacture* of alcohol or drugs is a material element of the crime." Ind. Code § 35-50-2-10(a)(2) (emphasis added). As discussed above, the State has provided sufficient evidence to sustain Warren's conviction for Class B felony Dealing in Methamphetamine. A material element of Class B felony Dealing in Methamphetamine that the State proved in the present case is that Warren knowingly or intentionally manufactured methamphetamine, placing it squarely under the statutory definition of a "substance offense."

The State has provided sufficient evidence of Warren's third conviction for a substance offense and therefore sufficient evidence to sustain his habitual-offender enhancement.

Affirmed in part, reversed in part.

BAILEY, J., and BROWN, J., concur.

19